In the

# United States Court of Appeals
### For the Seventh Circuit

No. 06-1577

ANTONIA P. KOCH,

*Petitioner-Appellee,*

*v.*

DANE J. KOCH,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 C 1158—**Lynn Adelman,** *Judge.*

ARGUED JUNE 5, 2006—DECIDED JUNE 13, 2006[1]

Before BAUER, ROVNER and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Dane J. Koch appeals from the district court's order granting Antonia P. Koch's petition under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S., No. 11,670, 1343 U.N.T.S. 89 ("Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601, et seq. ("ICARA"). We affirm.

---

[1] This opinion was originally issued in typescript.

## I.

We take the facts as the district court found them, supplementing as needed from the uncontested parts of the record. Dane J. Koch ("Dane") is a United States citizen who has spent most of his adult life living and working in Germany. At the time of the hearing before the district court, Dane had lived and worked in Germany for fourteen and a half of the prior eighteen years. He served in the military in Germany from 1987 until 1990, after which he remained in Germany where he worked, married, had two children, and then divorced his wife. Those children, with whom Dane has had no contact for several years, are not the subject of this dispute. In 1997, Dane met Antonia P. Koch ("Antonia"), a German citizen. After living together for some period of time in Germany, Dane and Antonia moved to the United States in February 1999. They were married in Wisconsin in August of that year. Their first child, Charles, was born in Wisconsin on February 20, 2000. Their daughter, Annalena, was born on April 2, 2002, also in Wisconsin. Both Charles and Annalena have dual citizenship in the United States and Germany. The children speak both English and German.

During their stay in Wisconsin, Dane started a business, which failed, and the couple went through bankruptcy proceedings. The marriage was also troubled. On at least one occasion, Dane physically abused Antonia. With poor financial prospects in the United States, Dane decided to take a job offer from his former employer in Germany. On April 13, 2002, when Annalena was just eleven days old, the couple moved back to Germany with their children. Dane and Antonia disagree about how long they intended to remain in Germany. Dane insists they agreed to stay two or three years, but Antonia believed they would be there for five to ten years. Both Dane and Antonia concede that, at the time they moved to Germany, they intended to stay long enough to save money to make a down payment on a home

and purchase two cars, an amount they estimated to be $20,000, and then return to the United States. Dane also wanted to obtain a vice-president position at his German employer because he believed holding a management position for a few years would enhance his resume. Dane did not believe he could otherwise obtain a management position because he lacked a college degree. Antonia took all of her personal belongings with her to Germany. Dane took nearly all of his possessions as well, leaving behind only a few items, including some tools, a shotgun and outdoor furniture. These items he left with a friend with the understanding that the friend could use the items in the Kochs' absence but that the Kochs might someday want the items back. They closed all of their bank accounts in the United States, leaving only a 401k plan that Dane held from a former employer.

Once in Germany, Dane and Antonia settled in Eschenbach and Dane obtained a three-year renewable work permit, the longest permit available. Dane's contract with his German employer had no set duration and Dane did not tell his employer that he planned to stay for a limited time period. They enrolled Charles in kindergarten, and Antonia was the primary caretaker for the children. Dane signed a contract for a savings plan that restricted his access to his deposits for three years.[2]

The couple continued to experience marital difficulties and Dane continued to physically abuse Antonia. Dane's abuse caused Antonia to spend one night with a friend and another in a shelter. In December 2004, Antonia told Dane

---

[2] According to Dane, at the end of the three-year period, the contract entitled him to remove his money without penalty and also allowed him to take out a loan for home renovations. According to Antonia, use of the account funds was restricted to the purchase or renovation of a home in Germany.

she wanted a divorce. Dane responded by angrily pushing Antonia onto a bed and choking her in front of the children. The next day, when Dane went to work, Antonia reported the incident to the police and took the children to Taunusstein, her hometown, a three- to four-hour drive from Eschenbach. Despite this attack, Antonia allowed Dane to visit the children. On December 17, 2004, Dane picked up the children for a short visit. Instead of returning them, however, he took them to the United States. He called Antonia once he was in the United States and told her that if she refused to come back to him, he and the children would remain in the United States. In the meantime, Antonia found an apartment in Taunusstein, where her mother lived, and procured an *ex parte* order from a German court awarding her the right to determine where the children would live.[3] On January 21, 2005, Dane returned to Eschenbach with the children. Antonia took the children back to Taunusstein where she enrolled them in kindergarten and cared for them with assistance from her mother. Charles began to experience emotional problems and, in March 2005, Antonia sent him to stay with Dane in Eschenbach in an attempt to resolve these problems. Because of his work schedule, however, Dane could not take care of Charles and returned him to Antonia after ten days.

One night in April 2005, Dane called Antonia after midnight and told her he was en route to Taunusstein to pick up the children. According to Dane, Antonia told him it was too late and he could not have the children that night. Over the next three or four hours, as he drove to Taunusstein, Dane called Antonia approximately fifty-five times, making a variety of threats. According to Antonia, Dane repeatedly threatened to kill her during these calls.

---

[3] Although the order was entered *ex parte*, Antonia told Dane that she was seeking this judicial determination, and Dane was thus aware of the proceedings.

When Dane arrived at Antonia's apartment building, she called the police and they arrested Dane on the sidewalk outside Antonia's building. The police seized from Dane a length of nylon rope he was carrying at the time of his arrest. The next day, Antonia obtained a restraining order against Dane, barring him from contacting her. Despite this order, she continued to allow Dane to visit the children. On May 5, 2005, Dane picked up the children for a weekend visit. On May 7, 2005, instead of returning the children as he had agreed, he again took them to the United States without Antonia's knowledge or consent. When Antonia was unable to contact Dane that weekend, she called the police, who attempted to prevent Dane from removing the children from Germany. They arrived at the airport too late to do so. Dane told neither his employer nor his landlord of his plan to leave Germany, and directed his family and friends "not to do Antonia's work for her" if she sought their assistance in finding him. He also took Antonia's address book with him, which made it difficult for her to contact friends and family members in the United States and Germany who might know where Dane was. The next week, Dane sent a letter of resignation to his employer in care of a friend in Germany (and asking the friend to deliver it) so that his employer could not trace his whereabouts.

Antonia immediately contacted the German consulate in Chicago, which directed her to the National Center for Missing and Exploited Children ("Center"). She also called Dane's mother in Wisconsin, who falsely claimed not to know the whereabouts of Dane and the children. In September 2005, Antonia discovered that Dane and the children were in fact living with Dane's parents in Wisconsin. The Center referred Antonia to an attorney and she promptly initiated this federal action to return the children to Germany. Also in September 2005, Dane obtained an *ex parte* order from a Wisconsin state court awarding him temporary custody of the children. In his affidavit to the

Wisconsin court, Dane falsely told the court that he did not know where Antonia was or how to get in touch with her, even though he admittedly knew exactly where she was, having visited her and called her at her apartment in Taunusstein many times. He also failed to tell the Wisconsin court that he had removed the children from Germany without Antonia's knowledge or consent.

Prior to their separation in Germany, Dane and Antonia had accumulated nowhere near the $20,000 they planned to save before returning to the United States. By Dane's own account of the couple's finances, after three years in Germany, the couple had $4,500 in a savings account. At the time he departed to the United States, Dane also had $3,000 from his regular paycheck. He owned a used Jeep with 120,000 kilometers on it that he purchased for 1,100 Euros and which he inexplicably hoped to sell for 14,000 Euros. Before Dane's December 2004 attack on Antonia, the couple had no plans to return to the United States in the foreseeable future and Dane had not achieved his goal of obtaining a management position to enhance his resume. At the time of their separation, other than the three-year stay in Wisconsin, Antonia had lived in Germany for her entire life. With the exception of that same three-year period, at the time of the separation, Dane had lived his entire adult life in Germany.

Antonia filed the present action under the Convention and ICARA in the federal district court for the Eastern District of Wisconsin, asking the court to return the children to Germany so that the parties could litigate custody issues in that forum. The district court noted that the principal issue under the Convention and ICARA was whether Dane had removed the children from Germany wrongfully. That question turned on the "habitual residence" of the children at the time they were removed. Because this circuit has not yet decided the standards for determining habitual residence, a term that is undefined in

the Convention, the court surveyed our sister circuits and also some international decisions. Many of the courts treated the inquiry as purely factual until the Ninth Circuit decided the case of *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). Following *Mozes*, most of the circuit courts adopted the Ninth Circuit's analysis, which required the court to determine whether the parents intended to abandon their previous habitual residence, judging that intent at the last time the parents had a shared intent. That shared intent, under the Ninth Circuit's approach, could be overcome if the child had become acclimatized to the new place. The district court initially disavowed the Ninth Circuit's approach, finding it inconsistent with the intent of the drafters of the Convention and with the jurisprudence of the other signatories. Applying a purely fact-based approach, the court found that the most important factors in determining habitual residence were geography and duration. Charles and Annalena had lived in Germany for more than three years, which constituted the near entirety of Annalena's life and well over half of Charles' life. The court found that in light of this duration, the parents' long-term plans regarding residence were largely irrelevant:

> Moreover, Dane, Antonia and the children were not in Germany on a visit nor was this a situation where one parent remained behind. Rather, the family moved to Germany as a family because Dane found work there. They took all of their belongings with them except for a few large items and established a home and a life in Germany. Dane worked, Antonia cared for the children and Charles attended school. Further, Dane and Antonia were not strangers to Germany, both having lived there for most of their adult lives. Thus, there can be little doubt that Charles and Annalena became habitual residents of Germany.

*Koch v. Koch*, 416 F. Supp. 2d 645, 652-53 (E.D. Wis. 2006). The court further noted that finding the children to be

habitual residents of Germany best served the underlying policy of the Convention, "to prevent the unilateral removal of children by one parent and to identify the place where the children are settled and where recent information about the quality of family life is available." *Koch*, 416 F. Supp. 2d at 653.

In the alternative, the court found that, even using the standards set forth in *Mozes*, Dane and Antonia had intended to abandon their habitual residence in the United States. The court based this finding on, among other things, the fact that the couple had lived in Germany for three years, that prior to their separation they had made no plans to return to the United States anytime soon, and that they had accumulated nowhere near the $20,000 that they needed to save before returning to the United States. The court found that, having abandoned the United States as their habitual residence, Germany was the habitual residence of the children at the time they were removed. The court therefore ordered Dane to return the children to Germany on or before March 1, 2006, and further ordered that Dane pay the fees and costs incurred in connection with Antonia's petition, including legal fees, court costs and transportation costs. Dane moved for a stay of this judgment in the district court, which the district court promptly denied. In denying the stay, the district court found that "the facts weigh so heavily against him Dane is unlikely to win [an appeal] under any approach." *Koch v. Koch*, No. 05 C 1158 (E.D. Wis. filed Feb. 27, 2006). Dane then filed his appeal in this court, and again moved for a stay. We granted a stay pending the resolution of the appeal, and ordered expedited briefing, in keeping with the intent of the Convention to provide prompt resolution to these disputes. We turn now to Dane's appeal.

**II.**

This case turns on the determination of the children's habitual residence, a term that is undefined in the Convention. If the habitual residence of the children at the time of their removal was the United States, then Dane's removal of the children to the United States would not be considered wrongful under the Convention. If, however, as the district court found, the children habitually resided in Germany at the time of their removal, then the children must promptly be returned to Germany so that an appropriate court of law there may determine the parties' respective custody and access rights. In his appeal, Dane argues that habitual residence is to be determined by focusing on the parents' last shared intent and, to a lesser degree, on evidence of the children's acclimatization to their surroundings. According to Dane, when this standard is applied, it is clear that the children were habitual residents of the United States on the date he removed them from Germany. Moreover, Dane argues, the children were not so acclimatized to Germany that Germany became their habitual residence contrary to their parents' intent. Dane complains that the district court applied the wrong legal standard, but maintains that we may simply reverse and remand with instructions to dismiss the petition rather than remand for application of the proper standard. Dane insists that a proper application of the law to the facts requires a conclusion that the children were habitual residents of the United States. Antonia argues on appeal that, under any standard, it is clear that the children were habitual residents of Germany at the time of their removal and that we may affirm outright.

**A.**

Because this is an issue of first impression in our circuit, we must begin by addressing the appropriate standard

of review. On this matter, our sister circuits are largely in agreement. They review the district court's findings of fact for clear error and review the court's application of the law to those facts as well as its interpretation of the Convention *de novo. See Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (11th Cir. 2006); *In re Adan*, 437 F.3d 381, 390 (3d Cir. 2006); *Holder v. Holder,* 392 F.3d 1009, 1015 (9th Cir. 2004); *Silverman v. Silverman*, 338 F.3d 886, 896 (8th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004); *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir.), *cert. denied*, 537 U.S. 1048 (2002); *Miller v. Miller*, 240 F.3d 392, 399 (4th Cir. 2001); *Mozes*, 239 F.3d at 1072; *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001); *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996). Seeing no reason to depart from the considered approach of our sister circuits, we too will apply this standard of review. To be clear, determinations of intent involve questions of fact and we will defer to the district court's findings on intent unless they are clearly erroneous. The ultimate determination of habitual residence is a mixed question of law and fact to which we will apply *de novo* review. This approach is consistent with all of the courts we have cited. *See, e.g.*, *Mozes*, 239 F.3d at 1075-76 ("Whether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court."); *Gitter v. Gitter*, 396 F.3d 124, 133 (2d Cir. 2005) (the intention of the parents is a question of fact in which the findings of the district court are entitled to deference). Dane contests both the district court's factual findings as to intent as well as the district court's application of the law to the facts.

**B.**

Both the United States and Germany are signatories to the Convention, which aims to prevent "the use of force to establish artificial jurisdictional links on an international

level, with a view to obtaining custody of a child." Elisa Perez-Vera, *Explanatory Report*, ¶ 11, 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982) (hereafter "Perez-Vera Report").[4] The preamble to the Convention specifies that the signatories desire "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence[.]" Convention, Preamble. The objects of the Convention are:

> a. to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and;
>
> b. to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

Convention, Article 1. *See also Holder*, 392 F.3d at 1013 (the primary object of the Convention is to secure the prompt return of children wrongfully removed to or retained in a Contracting State so as to deprive parties of any tactical advantage gained by absconding with a child to a more favorable forum); *Ruiz v. Tenorio*, 392 F.3d 1247, 1250-51 (11th Cir. 2004) (the purpose of the Convention is

---

[4] Professor Elisa Perez-Vera was the official Hague Conference reporter. "Her explanatory report is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." *Hague International Child Abduction Convention; Text and Legal Analysis*, 51 Fed. Reg. 10494, 10503 (1986). Many of our sister circuits treat the Perez-Vera Report as an authoritative source for interpreting the Convention's provisions. *See, e.g.*, *Gitter*, 396 F.3d at 129 n.4; *Mozes*, 239 F.3d at 1069 n.3. The full text of the Perez-Vera Report is available on the Internet at www.hiltonhouse.com/articles/Perez_rpt.txt.

to secure the return of wrongfully removed children and to ensure that rights of custody and access under the law of Contracting States are respected in the other Contracting States); *Silverman*, 338 F.3d at 897 (same). ICARA, the federal statute implementing the Convention, entitles a person whose child has been abducted to the United States to petition in federal court for the return of the child. 42 U.S.C. § 11603(b); *Van De Sande v. Van De Sande*, 431 F.3d 567, 568 (7th Cir. 2005). An action under the Convention and ICARA is not an action to determine the merits of custody rights. Convention, Article 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); Perez-Vera Report, ¶¶ 9, 19; *Ruiz*, 392 F.3d at 1250 (the court's inquiry under the Convention and ICARA is limited to the merits of the abduction claim and not the merits of the underlying custody battle). The court's task is to simply determine which country is the proper forum for that custody determination.

The Perez-Vera Report explains the common elements present in all wrongful removal cases: first, when a child is wrongfully removed, the "child is taken out of the family and social environment in which its life has developed." Perez-Vera Report, ¶12.[5] Second, the person who removes the child hopes to obtain a right of custody from the authorities of the country to which the child has been taken. Perez-Vera Report, ¶ 13. As Perez-Vera notes, the abductor typically hopes to gain an advantage by choosing a forum that he or she regards as more favorable to his or her claim. Perez-Vera Report, ¶ 14. The Convention seeks to discourage forum shopping in this manner by depriving the abduc-

---

[5] These comments apply to wrongful retentions as well as wrongful removals. Because we are addressing here a wrongful removal, for ease of understanding, we will focus our remarks on removal cases.

tor's actions of any practical or jurisdictional consequences. Perez-Vera Report, ¶ 16. "The Convention, in order to bring this about, places at the head of its objectives the restoration of the status quo, by means of prompt return of children wrongfully removed to . . . any Contracting State." Perez-Vera Report, ¶ 16; *Ruiz*, 392 F.3d at 1250 (the Convention is intended as a rapid remedy for the left-behind parent to return to the status quo before the wrongful removal or retention). If the Convention is applied, in most cases the final decision on custody will be made by the authorities of the child's habitual residence prior to its wrongful removal. Perez-Vera Report, ¶ 16.[6]

A removal is considered wrongful where:

a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, Article 3. The only element in this formulation that is under dispute in the instant case is the place of the children's habitual residence prior to their removal from Germany in May 2005. The Convention does not define the term habitual residence. In the legislation implementing the Convention, Congress recognized "the need for uniform international interpretation of the Convention" but did not attempt to define the term. 42 U.S.C. § 11601(b)(3)(B).

---

[6]  There are certain defenses, not at issue here, that might result in a district court declining to return a child to its habitual residence. For example, if a child faces a "grave risk of harm" in the place where it habitually resides, the court may decline to return the child to that place. 42 U.S.C. § 11603(e)(2)(A).

Perez-Vera described the notion of habitual residence as "a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile." Perez-Vera Report, ¶ 66.[7] "[T]he Hague Conference wished to avoid linking the determination of which country should exercise jurisdiction over a custody dispute to the idiosyncratic legal definitions of domicile and nationality of the forum where the child happens to have been removed. This would obviously undermine uniform application of the Convention and encourage forum-shopping by would-be abductors." *Mozes*, 239 F.3d at 1071. Thus, courts are instructed to "interpret the expression 'habitual residence' according to 'the ordinary and natural meaning of the two words it contains[, as] a question of fact to be decided by reference to all the circumstances of any particular case.'" *Mozes*, 239 F.3d at 1071 (quoting *C v. S.*, 2 All. E. R. 961, 965 (Eng. H.L. 1990)); *Ruiz*, 392 F.3d at 1252 (same); *Holder*, 392 F.3d at 1015 (same).

The *Mozes* court intended that the means for determining habitual residence should provide consistency and predictability in the result. 239 F.3d at 1072. Considering English law, the *Mozes* court noted that one way to determine habitual residence would be to observe behavior, an approach that the court believed suffered from the flaw of yielding differing results depending on the observer's time frame. 239 F.3d at 1073-74. The court therefore rejected an approach based purely on observation of behavior and turned instead to an assessment of intent:

> [T]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one

---

[7] In the United States, domicile is a person's legal home, the "permanent residence of a person or the place to which he [or she] intends to return even though he [or she] may actually reside elsewhere." Black's Law Dictionary 484 (6th Ed. 1990).

left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration. Of course, one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary. Nor need the intention be expressly declared, if it is manifest from one's actions; indeed, one's actions may belie any declaration that no abandonment was intended. If you've lived continuously in the same place for several years on end, for example, we would be hard-pressed to conclude that you had not abandoned any prior habitual residence. On the other hand, one may effectively abandon a prior habitual residence without intending to occupy the next one for more than a limited period. Whether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court.

*Mozes*, 239 F.3d at 1075-76 (footnotes omitted). In the case of young children, the court found it most prudent to focus on the intent of the parents rather than the intent of the child in determining the child's habitual residence. 239 F.3d at 1076.

Often, by the time one parent has filed an action under the Convention for the return of a child, the parents no longer share an intent on the child's habitual residence. Because of this complication, the *Mozes* court acknowledged that the representations of the parties likely cannot be accepted at face value, and the court should determine "from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is." 239 F.3d at 1076. The court included at one end of the spectrum families which jointly take all the steps associated with abandoning habitual residence in one country to take it up in another; in such a case, courts would generally be unwilling to let

one parent's reservations about the move stand in the way of finding a shared and settled purpose. 239 F.3d at 1076-77. At the other end of the spectrum are cases where the child's initial move from an established residence was clearly intended to be of a specific, delimited period; in these cases, courts have generally refused to allow the changed intentions of one parent to alter the habitual residence. 239 F.3d at 1077. In the middle are the cases where the petitioning parent earlier consented to let the child stay abroad for some period of ambiguous duration. In these cases, the circumstances surrounding the child's stay may sometimes suggest that, despite the lack of perfect consensus, the parents intended the stay to be indefinite, leading to an abandonment of the prior habitual residence. In other cases, the circumstances might suggest that there was no settled mutual intent to abandon the prior habitual residence. 239 F.3d at 1077. "Clearly, this is one of those questions of 'historical and narrative facts' in which the findings of the district court are entitled to great deference." *Mozes*, 239 F.3d at 1077-78 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 222 n.2 (3d Cir. 1995)).

The *Mozes* court allowed for circumstances in which, although the parents shared a settled intention on the habitual residence of a child, the child nonetheless became acclimatized to the new environment to such a degree that the child became a habitual resident of the new country despite the parents' shared intentions. 239 F.3d at 1078-79. *Mozes* noted that some courts consider whether the child is doing well in school, has friends, has family and social contacts in the new environment, and so forth, as a more straightforward and objective inquiry than whether the parents shared a settled intent. Nonetheless, the court concluded that, in the absence of settled parental intent, "courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." 239 F.3d at 1079. *See also Gitter*, 396 F.3d at 133 (to determine

habitual residence, the court should look first to the parents' last shared intention but should also consider whether the evidence points unequivocally to the conclusion that the child has become acclimatized to its new surroundings).

Although virtually every circuit court to consider the issue of habitual residence since *Mozes* has adopted some variation of its approach, the district court found the *Mozes* framework inconsistent with the intent of the drafters of the Convention and with the jurisprudence of the other signatories. *Koch*, 416 F. Supp. 2d at 651. In particular the district court objected to *Mozes*' assertion that the starting point of the habitual residence analysis is whether the parents intended to abandon the previous residence. Setting such a rule represented to the district court a departure from the purely fact-based inquiry followed by many courts around the world. The district court also opined that *Mozes* unnecessarily departed from the view that a joint intent by the parents to move plus some settled purpose was enough to change a child's habitual residence. The *Mozes* rule had the unfortunate effect, according to the district court, of making seemingly easy cases hard, and sometimes leading to questionable results. The court decided instead to apply a fact-based objective or behavioral approach, beginning "with the facts on the ground, most importantly those of geography and duration." *Koch*, 416 F. Supp. 2d at 652. As we noted above, the court then found that the children lived in Germany for more than three years, a relatively long time. The court noted that this was not simply a visit to Germany nor a situation where one parent remained behind. Rather, the entire family moved to Germany because that is where Dane found work. They took all of their possessions except for a few large items and established a home and life in Germany where Dane worked, Antonia cared for the children, and the children attended school. The district court noted that Dane and Antonia were not strangers to Germany; both had spent nearly their

entire adult lives there. Based on these facts, the court found there was no doubt that Germany was the habitual residence of the children at the time Dane removed them. The court found that this result best served the policy of the Convention to prevent unilateral removal of children by one parent and to identify the place where the children are settled and where recent information about their family life is most available. *Koch*, 416 F. Supp. 2d at 652-53. The court found in the alternative that, under the *Mozes* standard, Dane and Antonia intended to abandon their habitual residence in the United States. *Koch*, 416 F. Supp. 2d at 653. The court cited *Mozes* for the proposition that where a family has lived in one place for several years on end, "we would be hard-pressed to conclude that you had not abandoned any prior habitual residence." *Koch*, 416 F. Supp. 2d at 653 (quoting *Mozes*, 239 F.3d at 1075). Further applying *Mozes*, the court noted that, prior to their separation, Dane and Antonia had made no plans to return to the United States in the near future and had accumulated nowhere near the $20,000 they planned to save before returning. *Koch*, 416 F. Supp. 2d at 653. The court concluded from these facts that at the time Dane removed the children from Germany, Charles and Annalena were habitual residents of Germany.

## C.

The district court reluctantly used *Mozes* in the alternative, but we see no reason to disavow the *Mozes* approach and believe it is far more flexible than the district court inferred. *Mozes* asks the court to determine first whether the parents shared an intent to abandon the prior habitual residence, in this case, the United States. In determining the parents' intent, the court should look at actions as well as declarations. *Gitter*, 396 F.3d at 134. When Dane and Antonia moved to Germany, they shared a settled

intention to move there for an indeterminate period of time,
delimited by their financial circumstances and by Dane's
employment goals. Although they also shared a subjective
wish to someday return to the United States, habitual
residence is not determined "by wishful thinking alone."
*Mozes*, 239 F.3d at 1078. The establishment of a habitual
residence requires an actual change in geography, as well
as the passage of an appreciable amount of time. *Mozes*, 239
F.3d at 1078. "When the child moves to a new country
accompanied by both parents, who take steps to set up a
regular household together, the period need not be long." *Id.*

Following *Mozes*, most of our sister circuits focused on the
parents' last shared intent in determining habitual resi-
dence. *See, e.g.*, *Gitter*, 396 F.3d at 131-33 (finding the
*Mozes* opinion "particularly instructive" in determining
habitual residence by considering the intentions of the
parents as of the last time their intentions were shared);
*Ruiz*, 392 F.3d at 1252-55 (agreeing with *Mozes* that the
settled intention of the parents is a "crucial factor" in
determining habitual residence); *Whiting v. Krassner*, 391
F.3d 540, 548-550 (3d Cir. 2004), *cert. denied*, 125 S.Ct.
2938 (2005) (agreeing in part with *Mozes* that the parents'
shared intent determines whether a prior habitual resi-
dence has been abandoned and a new one formed);
*Silverman*, 338 F.3d at 899 (citing *Mozes* in support of using
the parents' shared intent to determine habitual residence).
Dane encourages us to assume that the couple's shared
intent to someday return to the United States is therefore
determinative on the issue of habitual residence here. But
shared intent to someday return to a prior place of resi-
dence does not answer the primary question of whether that
residence was effectively abandoned and a new residence
established by the shared actions and intent of the parents
coupled with the passage of time. *See Whiting*, 391 F.3d at
550; *Gitter*, 396 F.3d at 134.

In *Whiting*, the parents of an infant agreed that their
child would reside with the mother in Canada for a period

of two years and then would return to the United States depending on certain conditions. 391 F.3d at 549. The court found that the fact that the mother and child were to return to the United States subject to certain conditions did not in any way diminish the parents' settled intention that the two were to remain in Canada for at least two years. The court characterized this as an intent to abandon the United States for a definite and extended period in the life of the infant. Together with a settled purpose, this agreement shifted the habitual residence of the child to Canada:

> [T]he fact that the agreed-upon stay was of a limited duration in no way hinders the finding of a change in habitual residence. . . . Rather . . . the parties' settled purpose in moving may be for a limited period of time. Logic does not prevent us from finding that the shared intent of parents to move their eighteen-month old daughter to Canada for two years could result in the abandonment of the daughter's prior place of habitual residence. Put more succinctly, in our view, the intent to abandon need not be forever; rather, intent to abandon a former place of residency of a one year old child for at least two years certainly can effectuate an abandonment of that former habitual residence.

*Whiting*, 391 F.3d at 550 (citations omitted). There is no meaningful difference between the situation presented in *Whiting* and the facts of the instant case.

*Mozes* does not require courts to ignore reality. Because the parents both hoped to someday return to the United States, the district court apparently assumed that under *Mozes* this shared hope would conclusively determine that there was no shared intent to abandon the United States as the children's habitual residence. But *Mozes* was not so rigid, instead reflecting the realities of children's and family's lives despite the parent's hopes for the future. In applying the *Mozes* framework in a subsequent case, the

Ninth Circuit stated that it was "keenly aware of the flexible, fact-specific nature of the habitual residence inquiry envisioned by the Convention." *Holder*, 392 F.3d at 1015. The *Holder* court emphasized that "courts must consider the unique circumstances of each case when inquiring into a child's habitual residence." 392 F.3d at 1016. *See also Adan*, 437 F.3d at 392 (the determination of habitual residence is not formulaic; rather it is a fact-intensive determination that varies with the circumstances of each case); *Miller*, 240 F.3d at 400 (same). At the moment of departure and for some period thereafter, Dane and Antonia shared an intent, perhaps better described as a hope, to return someday to the United States. But this hope must be viewed in light of what the family actually did and the larger scope of what the parents intended. Dane and Antonia intended to move their family to Germany for an indeterminate period that they predicted would last any-where from two to ten years. They took nearly all their possessions with them, leaving no home to which to return in the United States. They closed their bank accounts in the United States. They set up a new home in Germany, including an employment contract of indefinite duration for Dane and schooling for the children. They opened a savings plan in Germany and developed a social life for themselves and their children. As time passed, they failed to meet their financial and employment goals. At the rate they were saving, they would have been in Germany for approximately ten more years before they saved $20,000.[8] They failed to

---

[8] At the time Dane removed the children from Germany, the couple had $4,500 in a savings account after three years in Germany. That means the couple was saving approximately $1,500 per year. We do not include in the savings figure the $3,000 paycheck Dane took to the United States, as this was not part of the couple's savings. We also do not include the used Jeep for which Dane paid 1,100 Euros as there was no evidence

(continued...)

make any plans to return. There is no evidence that Dane was looking for work in the United States; nor is there evidence that the couple sought legal status for Antonia, a German citizen, to live in the United States. *See Ruiz*, 392 F.3d at 1255 (failure of couple to seek legal status or citizenship for non-citizen parent is a factor to consider in determining intent to establish habitual residence). *See also Silverman*, 338 F.3d at 898-99 (in determining the degree of settled purpose from the children's perspective, the court should consider a family's change in geography along with personal possessions, the passage of time, the family abandoning its prior residence, the children's enrollment in school, and both parents' intentions at the time of the move, among other factors); *Holder*, 392 F.3d at 1018 (collecting cases where a change in habitual residence was evidenced by sale of a family home and shipment of family possessions to a new location). Their joint actions over those three years clearly demonstrated that the move to Germany was of a settled nature, indicating an intent to abandon the United States as a habitual residence and set up a new habitual residence in Germany. *See Silverman*, 338 F.3d at 898 (habitual residence must encompass some form of settled purpose but the settled purpose need not be to stay in the new location forever; rather the family must have a sufficient degree of continuity to be described as settled). As the *Mozes* court noted, one need not have a settled intention at the moment of departure; the intention may coalesce during the course of a stay abroad originally intended to be temporary. 239 F.3d at 1075. As in *Whiting*, Dane and Antonia agreed that their infant children would move to Germany for an indefinite, extended period of time for a settled purpose, and would return when certain conditions

---

[8]  (...continued)
that this car was appreciating in value or was part of the couple's savings.

were met. At the time Dane removed the children from Germany, those financial and employment conditions had not yet been met and thus the settled purpose of the move was still in force.

As *Mozes* stated, "[h]abitual residence is intended to be a description of a factual state of affairs, and a child *can* lose its habitual attachment to a place even without a parent's consent." 239 F.3d at 1081 (emphasis on original). Dane's counsel conceded at oral argument that after some period of time in the new environment, the habitual residence of the children will change regardless of the parents' hopes to someday return to the prior residence. That is what happened here, and the fact-findings of the district court support that conclusion. A description of the factual state of affairs can lead to only one conclusion here: as the district court found, the children's habitual residence was in Germany. The "objective facts point unequivocally" to the children's "ordinary or habitual residence being in" Germany. *Mozes*, 239 F.3d at 1081 (citing *Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.)). The question, as *Mozes* determined, is "whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child 'out of the family and social environment in which its life has developed.'" *Mozes*, 239 F.3d at 1081 (quoting Perez-Vera Report, ¶ 11). In Annalena's case, this should be self-evident. Before her father removed her to the United States, Annalena had lived in the United States for 11 days of her three-year life. Charles had lived in the United States for the first two years of his five-year life. Removal to the United States at that time was tantamount to taking the children out of the family and social environment in which their lives had developed. *See Feder*, 63 F.3d at 224 (habitual residence of a four-year old changed after six months when parents moved to new location intending to stay "for

at the very least the foreseeable future"). *Mozes* reminds us too that although residing habitually in a place means that a person has, in some sense, settled there, "it need not mean that's where you plan to leave your bones." 239 F.3d at 1074. Although we should be slow to infer in the absence of shared parental intent that children have changed their habitual residence through acclimatization, *Mozes*, 239 F.3d at 1079, a person "may effectively abandon a prior habitual residence without intending to occupy the next one for more than a limited period. Whether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court." *Mozes*, 239 F.3d at 1075-76 (footnotes omitted). *See also Feder*, 63 F.3d at 224 (a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective; the determination of whether a particular place satisfies the standard must focus on the child and consist of an analysis of the child's circumstances in that place and the parents' present shared intentions regarding their child's presence in that place). In light of all of the facts, we see no reason to disturb the district court's finding that Dane and Antonia shared a settled intention to abandon the United States as their habitual residence and take up Germany as their new habitual residence.

The *Mozes* court wanted parents to be able to predict the circumstances that will lead to a change in their children's habitual residence so that they may make intelligent and informed decisions about their children. 239 F.3d at 1072. For example, the court wanted parents to be able to predict the legal effect of traveling with a child to attempt a reconciliation with an estranged spouse or of consenting to a child's trip abroad to stay with relatives. *Id.* Our application of *Mozes* today falls well within those goals. As *Mozes* itself noted:

It is entirely natural and foreseeable that, if a child goes to live with a parent in that parent's native land on an open-ended basis, the child will soon begin to lose its habitual ties to any prior residence. A parent who agrees to such an arrangement without any clear limitations may well be held to have accepted this eventuality.

*Mozes*, 239 F.3d at 1082. *See also Mozes*, 239 F.3d at 1081 ("the agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence, *such as when there is effective agreement on a stay of indefinite duration*.") (emphasis added). Such is the case here where the children went to live with *both* parents in a country that was the mother's native land and the father's chosen residence for most of his adult life. The move was on an open-ended basis, tied to financial and employment goals, without any clear limitations. It should come as no surprise to Dane that settling his family in Germany for at least three and as many as ten or more years resulted in Germany becoming the habitual residence of his children. As *Mozes* aptly stated, a settled intention to abandon a prior habitual residence need not be expressly declared "if it is manifest from one's actions; indeed one's actions may belie any declaration that no abandonment was intended." 239 F.3d at 1075. In this case, Dane and Antonia's actions undoubtedly manifested a shared intent to remain in Germany for the foreseeable future.

As the district court noted, this conclusion also supports the goals of the Convention to return the parties to the status quo and discourage any would-be abductors from engaging in forum-shopping. *See Mozes*, 239 F.3d at 1079 ("The function of a court applying the Convention is . . . to determine . . . whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life."). Virtually all of the evidence relevant to the

custody dispute, virtually all of the evidence about the children's lives as of May 2005, is in Germany. Dane appears to have been seeking a friendlier forum to determine custody when he unilaterally removed the children from the place where they had lived in a settled fashion for three years. Indeed, Dane was facing criminal charges in Germany related to his attack on Antonia.[9] Dane has not contested on appeal the district court's finding that he in fact attacked Antonia and choked her in front of the children, and that this was one of many physical attacks perpetrated by Dane against Antonia during their time in Germany. Rather Dane argues that these facts are irrelevant to our determination of the children's habitual residence and are instead related to the merits of the custody dispute, merits we may not address. At least one other court has found that the physical abuse of one spouse by another is a relevant factor in the court's determination of the existence of shared intent to make a place the family's habitual residence. *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1056 (E.D. Wash. 2001). Dane's physical attacks against Antonia certainly gave him an incentive to seek a friendlier forum for custody, in contravention of the goals of the Convention and ICARA. And these physical attacks on Antonia, of course, would be relevant to certain defenses to allowing the children to remain in the United States even if that was their habitual residence at the time of their removal from Germany. *See* Note 5, *supra*. We are mindful that spouse abusers sometimes abuse the children as well, and that choking the mother in view of the children can itself be considered a form of child abuse. *Van De Sande*, 431 F.3d at 570 (father's threat to children could not be dismissed in light of gross

---

[9] Antonia's counsel indicated at oral argument in response to our question that there are still charges pending against Dane in Germany.

disregard of children's welfare displayed by beating and verbally abusing wife in the presence of the children). Thus physical attacks have some relevance in some situations to determining habitual residence issues, but we need not address those issues any further here because Antonia has not relied on them. We affirm the district court's finding that Germany was the habitual residence of Charles and Annalena at the time of their removal to the United States.

## III.

We affirm the district court's judgment for the reasons we have stated above. The district court ordered that the children be returned to Germany by March 1, 2006. We stayed that order pending the appeal and that date has now passed. In order to return the children expeditiously to their habitual residence, we lift our stay and order that the children be returned to Germany as soon as is practicable but no later than seven days from the entry of this opinion. We also affirm the district court's order that Dane pay the fees and costs that Antonia incurred in connection with the petition, including but not limited to legal fees, court costs and transportation costs, including transportation costs related to the return of the children. 42 U.S.C. § 11607(b)(3). The mandate shall issue forthwith.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*