In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 16-1609

JADED MAHELET RUVALCABA MARTINEZ,

*Petitioner-Appellant*,

*v.*

PETER VALDEZ CAHUE,

*Respondent-Appellee*.

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 11411 — **John J. Tharp, Jr.,** *Judge*.

———————

ARGUED JUNE 1, 2016 — DECIDED JUNE 24, 2016

———————

Before WOOD, *Chief Judge*, and BAUER and FLAUM, *Circuit Judges*.

WOOD, *Chief Judge*. For the first seven years of A.M.'s life, he lived in Illinois with his mother, Jaded Mahelet Ruvalcaba Martinez. A.M.'s father, Peter Valdez Cahue, lived nearby, although he and Martinez never married. They entered into a private arrangement, never formalized through a court order, for custody and visitation rights. The events leading to the lawsuit before us arose when, in 2013, Martinez moved to

Mexico and took A.M. with her. About a year later, Cahue per-
suaded Martinez to send A.M. to Illinois for a visit; he then
refused to return A.M. to Mexico. Martinez petitioned for his
return under the Hague Convention on Civil Aspects of Inter-
national Child Abduction ("the Convention"), T.I.A.S. No.
11670, 1343 U.N.T.S. 89 (Oct. 25, 1980), to which both the
United States and Mexico are parties. The Convention has
been implemented in the United States through the Interna-
tional Child Abduction Remedies Act, 22 U.S.C. §§ 9001 *et seq.*

Relying heavily on its finding that Martinez and Cahue
did not share the view that A.M.'s habitual residence (a term
of art under the Convention) would be shifted to Mexico, the
district court found that Illinois remained A.M.'s habitual res-
idence and dismissed Martinez's petition. We conclude that
the district court asked the wrong question, and thus came to
the wrong answer. At all relevant times, Martinez had sole
custody of A.M. under Illinois law, while Cahue had no right
of custody either under Illinois law or the Convention. That
means that only Martinez's intent mattered, and it is plain that
Martinez wanted A.M.'s habitual residence transferred to
Mexico. Cahue's retention of A.M. in Illinois was therefore
wrongful and he must be returned to Mexico.

**I**

A.M. was born in 2006 in the Chicago suburb of Oak Lawn,
Illinois. Although Cahue voluntarily acknowledged his pater-
nity at A.M.'s birth, A.M. lived with Martinez for his entire life
until Cahue retained him in Illinois in 2014. With minor ex-
ceptions, Martinez and Cahue lived separately for most of
their ten-year on-again, off-again relationship. They appear to
have cooperated relatively well, however, with respect to
A.M. On February 24, 2010, Martinez and Cahue entered into

a private written custody agreement in which Cahue stipulated that he would "NOT fight custody in court for [A.M.]," but would be guaranteed "constant access" and overnight visits "2 nights a week." Neither parent ever took steps to memorialize this arrangement in a court order.

In the spring of 2013 Martinez, a Mexican citizen who worked at the Mexican Consulate in Chicago, began contemplating a move back to Mexico. She asserts that "everyone," including Cahue, knew that she was moving. He denies that he knew that she was planning to relocate *permanently* to Mexico or that she was planning to change A.M.'s domicile. Instead, Cahue says, Martinez told him that she and A.M. were going to Mexico on vacation. The district court believed Cahue's version of events and found that Martinez did not tell Cahue that she was taking A.M. to live in Mexico. Martinez has not challenged that factual finding on appeal, and so we accept it.

On July 26, 2013, Cahue signed a notarized letter authorizing A.M. to travel to Mexico. After two weeks, he began calling Martinez and asking when she planned to return. On August 7, he sent her $300 for gas, because (he says) Martinez had told him that she might drive back to Chicago. Then Martinez stopped communicating with Cahue altogether. Cahue contacted Martinez's mother, sister, and father, but learned nothing; he also spoke with the Oak Lawn police, who told him that there was nothing they could do.

In the meantime, Martinez and A.M. settled into their new life in Mexico. Martinez began work, and A.M. enrolled in a highly regarded private school in Aguascalientes. After a brief period of adjustment, A.M. excelled in the new school. He played soccer (fútbol) on several elite teams, and he

earned a scholarship. He had friends at school and on his sports teams, spoke Spanish fluently, attended church regularly, and spent time with his extended family in Mexico.

But from Cahue's point of view, matters were not settled. That fall, he consulted an attorney, who informed him of his rights under the Convention. The attorney began preparing documents for a petition Cahue could file under the Convention, but he had to withdraw after discovering what he considered a conflict of interest. Cahue did not seek alternate representation, nor did he file the petition *pro se*.

Meanwhile, Martinez pursued legal action in Mexico. On October 16, 2013, she filed a petition against Cahue for child support and an order of protection. Martinez testified that she told Cahue about the petition, but she never served it on him. Instead, she and Cahue agreed to a visitation plan and she dropped the petition before the Mexican court ruled on it. According to the plan, Cahue and A.M. would see each other in December 2013, April 2014, and July 2014, during A.M.'s school vacations. The December visit did not take place, but Martinez and Cahue made plans for A.M. to visit Cahue in April 2014 as contemplated.

In December 2013, Cahue began communicating with the U.S. Department of State. A person on the Mexican desk, Rosemarie Skelly Mendoza, explained his rights under the Convention and sent him a blank petition for relief. Cahue never filed it, but he did keep in touch with the State Department by email. As planned, A.M. visited his father during the April 2014 spring break, from April 26 through May 4, and at the end of the visit, Cahue sent him back to Mexico. Cahue testified that he thought about keeping A.M. at that time, but he did not because Martinez had already agreed to allow

A.M. to visit Cahue that summer, and he did not want to disrupt A.M.'s school year.

In July, Martinez again sent A.M. to Chicago as agreed, thinking that he would stay there for another short visit and be back in time to start school on August 18, 2014. At first, Cahue bought only a one-way air ticket, but Martinez called his bluff: she refused to allow A.M. to travel without a return ticket. Cahue appeared to capitulate and bought the round-trip ticket. But Martinez's suspicions were well founded. As Cahue later admitted, he had no intention of sending A.M. back to Mexico.

Martinez learned this on August 16, 2014, when she went to the airport to pick up A.M. and he never arrived. When Martinez contacted Cahue, he told her that he had forgotten about the flight, and then he stopped answering her calls. On August 21, he contacted the State Department and asked it to put A.M.'s passport "on hold" so that A.M. could not leave the United States.

Martinez flew to Illinois on August 25, 2014, meaning to reclaim her son. She arrived at Cahue's home that day, surprising him; with A.M. in tow, she decamped to her parents' home in Illinois. Two days later, Cahue filed a petition for custody in Illinois court, along with an emergency motion for immediate possession of A.M. and preliminary and permanent injunctions barring Martinez from removing A.M. from Illinois. The state court granted his emergency motion, after which Cahue sent the police to Martinez's parents' home, the police seized A.M., and they returned him to Cahue. Martinez promptly obtained counsel, filed an answer to Cahue's petition for custody, and attended a hearing in Illinois court on September 17, 2014. The court continued Cahue's temporary

possession of the boy and ordered the surrender of A.M.'s U.S. and Mexican passports.

After those developments, Martinez returned to Mexico, where she resumed her legal fight. On February 6, 2015, she filed her petition under the Convention with the Mexican Central Authority. The U.S. State Department received the petition on March 13, 2015. Then on December 15, 2015, after she discovered that Cahue had obtained a new U.S. passport for A.M., Martinez commenced emergency proceedings in the district court and filed her verified petition in the Northern District of Illinois for A.M.'s return to Mexico.

The district court held an evidentiary hearing, after which it determined that there was sufficient evidence that A.M. had acclimatized to Mexico during the year he lived there with his mother. It also found, however, that Cahue and Martinez did not jointly intend that A.M. should move to Mexico in the first place. To the contrary, it said, Martinez took A.M. to Mexico without Cahue's permission or knowledge (presumably about the permanence of the move—Cahue admitted that he knew about the trip). Emphasizing the absence of shared parental intent, the district court held that Illinois had remained A.M.'s habitual residence during the year he spent in Mexico, and thus Martinez's petition had to be dismissed. Martinez appeals from that judgment.

## II

The Convention represents an international effort to deal with the vexing problem of child custody when more than one country is involved. It is fundamentally "an anti-abduction treaty." *Garcia v. Pinelo*, 808 F.3d 1158, 1162 (7th Cir. 2015) (quoting *Redmond v. Redmond*, 724 F.3d 729, 742 (7th Cir.

2013)). Its dual purposes are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Id*. (quoting Convention art. 1, T.I.A.S. No. 11670). To fulfill the latter purpose, it seeks "to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction." *Id*. (quoting *Walker v. Walker*, 701 F.3d 1110, 1116 (7th Cir. 2012)). The Convention is based on the principle "that a child's country of habitual residence is 'best placed to decide upon questions of custody and access.'" *Id*. (quoting *Whallon v. Lynn*, 230 F.3d 450, 456 (1st Cir. 2000)).

Key among the Convention's provisions is its "remedy of return," which "entitles a person whose child has wrongfully been retained in the United States in violation of the Convention to petition for return of the child to the child's country of 'habitual residence.'" *Id*. (citations and quotation marks omitted). A removal or retention is wrongful under the Convention where it is "in breach of rights of custody … under the law of the state in which the child was habitually resident immediately before the removal or retention," and "at the time of removal or retention those rights were exercised … or would have been so exercised but for the removal or retention. Convention art. 3, T.I.A.S. No. 11670.

The pivotal question under the Convention is generally that of habitual residence. *Redmond*, 724 F.3d at 742. "In practical terms, the Convention may be invoked only where the child was habitually resident in a Contracting State and taken

to or retained in another Contracting State." *Id*. at 737 (quoting U.S. Dep't of State, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,504 (Mar. 26, 1986)).

The district court recognized this. We review its findings of fact for clear error, and its conclusions of law (including the legal framework it adopts) *de novo*. The determination of habitual residence is a "mixed" question of law and fact, see *Redmond*, 724 F.3d at 743 (quoting *Koch v. Koch*, 450 F.3d 703, 710 (7th Cir. 2006)), to which we have given *de novo* review. See *id*. at 742. We have done so because this question is antecedent to many other issues under the Convention, and it is often determinative: if a child is currently located in her habitual residence, her presence in the country (whether by removal or retention) is not wrongful. *Id*. at 737. In order to assure both the national and the international uniformity that the Convention was designed to achieve, *de novo* review is essential. *Cf. Ornelas v. United States*, 517 U.S. 690, 697 (1996) (requiring independent appellate review of determinations of reasonable suspicion or probable cause, because they "acquire content only through application" and "[i]ndependent review is … necessary if appellate courts are to maintain control of, and to clarify, the legal principles"). To the extent that "habitual residence" turns on findings of historical fact, such as the intentions of the parties or the child's adjustment to a new environment, our review is deferential.

### A

The Convention does not define "habitual residence," but we have understood the inquiry to be a "practical, flexible, factual" one that "accounts for all available relevant evidence and considers the individual circumstances of each case."

*Redmond*, 724 F.3d at 732 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1071 (9th Cir. 2001). As the term suggests, the search is for the place where the child has made his or her home; it identifies the country whose courts should be entrusted with determinations such as custody and support. Generally "[a] court should infer a change in habitual residence only where [it] 'can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed.'" *Id*. at 745 (quoting *Mozes*, 239 F.3d at 1081).

The two most important factors in the analysis are parental intent and the child's acclimatization to the proposed home jurisdiction. *Id*. at 744–45. Courts have differed on the weight each factor should receive. We have tended to privilege the parents' perspective, *id*., but even so, we have stressed that this emphasis is dependent on the circumstances. *Id*. at 746. We also have noted that "[t]he intention or purpose which has to be taken into account is that of the *person or persons* entitled to fix the place of the child's residence." *Id*. at 747 (quoting *Mozes*, 239 F.3d at 1076). Importantly, shared intent "has less salience when only one parent has the legal right" to determine residence. *Id*.

1

We consider first the question whether Martinez's initial removal of A.M. to Mexico in July 2013 was subject to any legal restrictions that might allow Cahue's intent to affect the analysis. Martinez argues that, as the parent with sole custody of A.M., she had the exclusive right to establish his habitual residence. This is not quite accurate. In Illinois, a custodial

parent's discretion to remove a child from the state is not completely unrestrained. In the absence of a custody order, she is not required to seek the court's permission to relocate outside of Illinois. See *In re Parentage of R.B.P.*, 915 N.E. 2d 434, 439 (Ill. App. Ct. 2009) (holding that where there is no custody order, a mother need not seek permission under 750 ILCS 5/609 (2013) to leave the state). Nevertheless, a custodial parent may be enjoined "upon application by any party" from relocating with a child outside of Illinois "pending the adjudication of the issues of custody and visitation." 750 ILCS 45/13.5(a) (2013). The latter section applies only in an "action brought under [the Illinois Parentage Act of 1984] for the initial determination of custody or visitation of a child or for modification of a prior custody or visitation order." A party may obtain an injunction under section 13.5 even if the parentage action commences after the custodial parent has left the state. *Hedrich v. Mack*, 27 N.E.3d 666, 670 (Ill. App. Ct. 2015). At the conclusion of the proceeding, even if the resulting court order grants her sole custody, the custodial parent must show that moving "is in the best interests of [the] child." 750 ILCS 5/609(a) (2013); see also *Fisher v. Waldrop*, 849 N.E.2d 334 (Ill. 2006) (section 609(a) applies where there is a custody order in place).

But Cahue never obtained rights of custody for Convention purposes under these statutes, nor was Martinez's right to relocate A.M. constrained by them. In the absence of a court order, Illinois law presumes that the mother of a child born out of wedlock has sole custody. See 720 ILCS 5/10–5(a)(3) (2013) (for purposes of statute on child abduction it is "presumed that, when the parties have never been married to each other, the mother had legal custody of the child unless a valid court order states otherwise"); 750 ILCS 45/14(a)(2) (2013)

(presuming mother had legal custody even where there has been a judgment of paternity if no order grants custody to the father, unless he has had physical custody for at least six months prior to the date when the mother seeks to enforce her custodial rights); see also *In re Arthur H.*, 819 N.E.2d 734, 756-57 (Ill. 2004) (Garman, J., dissenting). Joint custody does not arise automatically; a court must award it. See 750 ILCS 5/602.1(b) (2013). Moreover, joint custody is not the default option: a court may confer joint custody only "if it determines that joint custody would be in the best interests of the child." *Id.* § 602.1(c).

Cahue did not obtain a custody order during the time that mattered. His agreement with Martinez provided him only with agreed visitation rights—that is, a right of access that does not trigger the remedy of return under the Convention. See *Abbott v. Abbott*, 560 U.S. 1, 13 (2010). And even if that agreement had spoken to custody, it would not have legal effect: Illinois courts generally do not respect private agreements affecting custody. See *In re Marriage of Linta*, 18 N.E.3d 566, 570 (Ill. App. Ct. 2014) (noting that "the law severely limits on public-policy grounds the enforceability of contracts affecting the custody … of children" and "*per se* rejects premarital agreements that … specify custody"). In July 2013, therefore, Cahue had no custody rights under Illinois law.

Neither did Illinois accord him the lesser right of *ne exeat*, which is a joint right to determine a child's country of residence. See *Abbott*, 560 U.S. at 10 (holding *ne exeat* to be right of custody under the Convention). While section 13.5(a) provides a mechanism to enjoin temporarily the removal from, or compel the return of a child to, the state of Illinois, it is not a right to veto the relocation. It merely requires that the removal

be subjected to the scrutiny of a court. The court then determines whether relocation should be enjoined pending the adjudication of the custody question, considering the petitioner's previous involvement with the child, the likelihood of parentage, and the impact on the person being enjoined. 750 ILCS 45/13.5(a) (2013). The injunction lasts only until the adjudication of custody or visitation is completed. After that, the custodial parent may remove the child if a court finds that it "is in the best interests of [the] child." 750 ILCS 5/609(a) (2013). The noncustodial parent has no right to determine the child's location; he or she has only the right to ask a court to supervise. These laws show that Cahue never took the proper steps to secure the rights on which he is trying to rely. There was no existing custody order or even a pending custody proceeding relating to A.M. in July 2013. As a result, neither section 13.5(a) nor section 609(a) could have restrained Martinez from moving to Mexico with A.M.

Cahue asserts that because he and Martinez executed a Voluntary Acknowledgement of Paternity at A.M.'s birth, and because 750 ILCS 46/305(a) (2016) "confers upon the acknowledged father all of the rights and duties of a parent," he has rights of custody as a matter of law. There are two problems with this theory. First, section 305(a) was not enacted until 2016. Second, even a judgment of paternity does not in itself confer any rights of custody or visitation. See *In re Parentage of J.W.*, 990 N.E.2d 698, 706 (Ill. 2013) ("[A] judgment of paternity does not automatically entitle a biological father to visitation."); *J.S.A. v. M.H.*, 863 N.E.2d 236, 253 (Ill. 2007) (noting that "the right of a biological father to establish paternity to a child born to a marriage does not also mean that the legal

rights flowing from the parent and child relationship," including custody, "are automatically conferred").

Cahue's argument to the contrary finds no support in Illinois law. Nor are we persuaded by his criticism of our reliance on *Redmond*. It is true, as he points out, that unlike the father in *Redmond*, whom Irish law did not recognize as a parent, Cahue is A.M.'s acknowledged father. We accept that for some purposes this has legal consequences. But the Convention insists on a particular right—the right of custody—and Cahue lacked that both when Martinez moved to Mexico in July 2013 and when Cahue refused to return A.M. to his mother in August 2014. Neither did Illinois law restrict Martinez's movement of A.M. at either time. At both times that mattered, Cahue had no legal right to decide A.M.'s residence, and Martinez had an unrestricted right to do so.

When Martinez moved to Mexico with A.M., she may have violated the terms of the couple's private custody agreement. But the move did not violate a right of custody for Convention purposes. Martinez's removal of A.M. to Mexico was therefore not wrongful. See *Redmond*, 724 F.3d at 738–39; *White v. White*, 718 F.3d 300, 304-06 (4th Cir. 2013). Nor did it violate Illinois law. Because only Martinez has rights of custody under the Convention, and Illinois law did not in any way restrict her right to move away from the country with her son, only her intent was of legal significance.

2

The second key consideration in determining habitual residence is the extent to which the child has acclimatized to one or the other place. The district court found that by August 2014, A.M. had acclimatized to Mexico. While A.M. had spent

most of his life in Illinois, that fact is not dispositive. (That would create the kind of formulaic, ratio-based test that appears nowhere in the Convention.) By the end of his first year in Mexico, he displayed all of the indicia of habitual residence, including friends, extended family, success in school, and participating in community and religious activities. The district court found that A.M. had adapted successfully to Mexico, and that finding is not clearly erroneous. Based on Martinez's intent that he change habitual residence, the lack of any right on Cahue's part to veto her preference, and A.M.'s own successful acclimatization, we conclude that Mexico was A.M's habitual residence at the time Cahue acted to retain him in the United States.

B

Because the district court found that A.M.'s habitual residence was Illinois, it had no reason to evaluate the wrongfulness of Cahue's 2014 retention of A.M., or any possible defenses that Cahue might have raised. Although it will sometimes be desirable to remand to the district court for it to consider wrongfulness and possible defenses in the first instance, that will depend on how well the record is developed, whether the parties have had an opportunity to brief the issues, and how time-sensitive the case is. In this instance, those considerations persuade us to take up these issues now, without a remand.

1

As we noted earlier, a removal or retention is wrongful under the Convention if it is "in breach of rights of custody … under the law of the state in which the child was habitually resident immediately before the removal or retention"; and

"at the time of removal or retention those rights were exercised … or would have been so exercised but for the removal or retention." Convention art. 3, T.I.A.S. No. 11670.

Cahue admits that he retained A.M. in Illinois without Martinez's consent. In doing so, he violated her rights of custody under Mexican law. See Civil Code for the State of Aguascalientes, arts. 434, 437, 440–41; *Garcia*, 808 F.3d at 1164 (noting that the right called *patria potestas* is "a 'right of custody' under the Convention" that is conferred to both parents, and whose "central values" are "fairness and reciprocity"). Martinez regularly sought contact with A.M. from the time Cahue retained him forward. See *Walker*, 701 F.3d at 1121 (noting that "any sort of regular contact" with the child qualifies as "exercising … custody rights" under the Convention). Cahue's retention of A.M. was wrongful under the Convention.

2

Because Cahue's retention of A.M. in July 2014 was wrongful, A.M. must be returned to Martinez unless Cahue can show that either of the two defenses he presented applies: that A.M. is now so "settled in [his] new environment" that he should not be returned, see Convention art. 12, T.I.A.S. No. 11670, or that Martinez "subsequently acquiesced in the … retention," see *id*. art. 13(a). It is important, in evaluating these defenses, to bear in mind that even if the facts provide some support for a defense, "a court still has discretion to order the return of a child if it would further the aim of the Convention[,] which is to provide for the return of a wrongfully removed child." *Garcia*, 808 F.3d at 1167 (quoting *de Silva v. Pitts*, 481 F.3d 1279, 1285 (10th Cir. 2007)). The Convention achieves its aims both by returning children in individual cases and by deterring future abductions or wrongful retentions. *Id.* at

1168–69. "The Convention's 'defenses … are narrowly con-strued' at least in part to preserve that deterrence." *Id.* at 1169 (quoting *de Silva*, 481 F.3d at 1285). Where applying a defense would undermine the deterrent effect of the Convention's sys-tem, a court should hesitate to take that step.

The record here is equivocal at best on the applicability of the "settled-child" defense, and as our account of the facts demonstrates, it does not support a finding that Martinez ever acquiesced in Cahue's actions. Moreover, it was Cahue who willfully circumvented the Convention's procedures, time and again. Based on his conversations with an attorney and State Department personnel, Cahue was aware of his legal remedies. He nevertheless declined to exercise them because he "knew [he] wouldn't have won" (as he put it) on the peti-tion. Instead, he took advantage of Martinez's good faith and made her think that it was safe to send A.M. to Illinois for a visit. He lulled Martinez into a false sense of security when he returned A.M. to Mexico at the conclusion of A.M.'s spring-break stay.

Cahue may have tipped his hand when he bought the one-way ticket for the summer visit, but when Martinez raised the point, he changed it to a round-trip ticket. Yet all the while, he planned to keep A.M. with him. In the past, we have sharply criticized such "self-help" measures, even suggesting that there should be an anti-self-help poison pill: where a parent exercises self-help instead of using the Convention's legal remedies, he or she would transform the other parent's juris-diction into the child's habitual residence. See *Kijowska v. Haines*, 463 F.3d 583, 588–89 (7th Cir. 2006). We need not go that far now, however, and we note that any such step should never lose sight of the best interests of the child. It is enough

to say that in this case, rewarding Cahue's strategy would be quite damaging to the deterrent effect of the Convention.

Cahue has also taken advantage of Martinez's pursuit of her legal remedies through the Convention: during the pendency of her petition, he has worked actively to cement his advantage in the courts of Illinois, his preferred jurisdiction. When Martinez flew to Illinois, Cahue obtained an emergency order from an Illinois court to keep A.M. there. After Martinez returned to Mexico, despite her pending petition under the Convention, he sought and obtained a default judgment in state court granting him sole custody. Martinez instituted the present emergency proceeding after she discovered that Cahue had obtained a new passport for A.M. and taken him to Mexico without her knowledge or consent.

It is unclear whether the Illinois default judgment can or will be reopened, and the Convention does not in principle concern itself with custody decisions. Nevertheless, allowing Cahue to gain an advantage from circumventing and exploiting the Convention in this way would pervert its goals. After all, the Convention "seeks … to prevent a later decision on" custody from "being influenced by a change of circumstances brought about through unilateral action by one of the parties." *Garcia*, 808 F.3d at 1162 (quoting Elisa Pérez–Vera, *Explanatory Report: Hague Conference on Private International Law* ¶ 71, in 3 *Acts and Documents of the Fourteenth Session* 426, 447–48 (1980)). Here, declining to apply the Convention's remedy of return would do just that.

## III

Martinez's initial decision to move A.M. to Mexico was lawful: she had sole custody over A.M. under Illinois law, and

neither Illinois law nor the Convention precluded her from moving with her son to Mexico with or without Cahue's permission. Cahue had no rights of custody over A.M. that qualified Martinez's position. Once in Mexico, A.M. adapted readily to his new home, such that by August 2014, when his father refused to return him, he was being kept from his habitual residence. Cahue retained A.M. in violation of Martinez's rights of custody under Mexican law—rights that she exercised continuously. Cahue's retention of A.M. was therefore wrongful under the Convention. Finally, applying a defense here would not serve the aims of the convention.

We REVERSE the judgment of the district court and order that A.M. be returned to Martinez's custody in Mexico at the earliest possible time.