# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-3602

IAIN WALKER,

*Petitioner-Appellant*,

*v.*

NORENE WALKER,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 C 2967—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED SEPTEMBER 11, 2012—DECIDED NOVEMBER 16, 2012

Before BAUER, POSNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Iain Walker, a citizen of Australia, filed this suit under the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq.*, in an effort to compel his wife, Norene, a citizen of the United States, to return the couple's three children to Australia. ICARA implements the Hague Convention on the Civil Aspects of International Child Abduction (the Convention), T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980).

The Convention, to which both the United States and Australia are parties, "entitles a person whose child has wrongfully been [retained in] the United States . . . to petition for return of the child to the child's country of 'habitual residence,' unless certain exceptions apply." *Norinder v. Fuentes*, 657 F.3d 526, 529 (7th Cir. 2011).

The district court denied Iain's petition. It found that notwithstanding the fact that the Walker family lived in Australia from 1998 until 2010, the children's habitual residence had become the United States by the time Iain filed his petition. In addition, as the court saw it, Norene's act of keeping the children in the United States could not have been "wrongful" within the meaning of the Convention for two reasons: first, Iain was not exercising his custody rights at the relevant time; and, second, Iain had consented to the children's remaining in the United States permanently. Iain challenges all of these rulings on appeal. We conclude that the record does not support the court's decision and that a remand is necessary before the case can be resolved.

# I

Iain and Norene were married in Chicago in 1993. They lived in Seattle, Washington, until 1998 when they moved to Perth, in Western Australia. The couple's eldest child was born in the United States in 1997, but lived in this country only one year; the two younger children were born in Australia in 1999 and 2001.

Although Norene testified that she and Iain initially intended to stay in Australia for only five years, they

ended up spending 12 years there. Over this period, they and their children appeared to be well-settled: they owned a home, furniture, and a dog named Chubba; the children attended school, had friends, and participated in activities; and Iain worked as a software test engineer while Norene cared for the children.

In June 2010, the Walkers traveled to the United States. When they left Australia, both Iain and Norene expected that Norene and the children would remain in the United States for six months to one year. There the common ground ends. According to Iain, the plan was for Norene and the children to live with Norene's parents in Chicago while the family demolished its existing house in Perth and built a new one. According to Norene, the trip was intended as an extended prelude to a permanent move to the United States; she testified (a bit inconsistently, it seems to us) that Iain promised to look for a job in Chicago and that they looked at real estate in San Francisco and Seattle. Although both recalled that Norene and the children had concrete plans to return to Australia by June 2011 at the latest, Norene labeled this most likely a temporary visit and Iain understood it to be a permanent return. After spending several weeks with Norene and the children in the United States, Iain returned to Australia in late July 2010.

As may be apparent, all was not well with the marriage. In November, Norene filed for divorce in Cook County, Illinois. As of that time, she said, she had not made up her mind whether she (and presumably the children) would remain in the United States permanently or return to Australia.

Upon receiving Norene's petition for divorce, Iain's lawyer in Australia sent a letter to Norene's attorney offering to settle the divorce out of court. The lawyer described the letter, which was transmitted on January 21, 2011, as a "once off attempt to have all outstanding matters resolved." In it he made, "on a without prejudice basis," certain proposals that were expressly conditioned on Norene's acceptance of Iain's offer. For example, in exchange for granting primary custody to Norene and allowing the children to remain in the United States, Iain wanted to be guaranteed custody of the children for the full nine weeks of their summer vacation and for two weeks over the Christmas holidays; he further requested that he be allowed to visit the children in the United States at least twice a year. The letter also dealt with the division of property.

Notably, the letter explicitly referred to the Hague Convention. On Iain's behalf, the lawyer asserted that "[t]he parties' habitual residence is quite clearly Australia," and that Iain "would clearly be entitled to bring an Application under the Hague Convention to have the children returned to Australia." In closing, the letter stated "this offer is open for a period of 7 days . . . and if not accepted [Iain] will then proceed to exercise his full rights pursuant to the Hague Convention, and do all that is required to ensure that proceedings are transferred" to the Family Court of the State of Western Australia.

The January 21 letter marked a turning point for Norene. She regarded it as giving her permission to stay

in the United States and indicating that Iain "didn't want the kids." She testified that shortly after receiving the letter, she made up her mind not to return to Australia. Norene did not, however, accept Iain's offer of settlement; after an exchange of several more letters, the negotiations ended without a resolution in mid-February. Iain immediately filed a request for the return of the children with the Australian Central Authority charged with administering the Convention. In May, Iain filed a petition for return in the district court for the Northern District of Illinois.

Following a two-day evidentiary hearing, the district court denied the petition. This appeal followed.

## II

### A

Before discussing the merits of the district court's decision, we must address two preliminary issues. First, Norene argues that this case was mooted by an Illinois state-court judgment awarding sole custody of the children to Norene. According to Norene, the Illinois judgment conclusively resolves the parties' custody dispute in her favor and thus precludes this court from ruling that the Hague Convention requires the custody determination to occur in the courts of Australia.

Norene is mistaken: the case is not moot. Article 17 of the Hague Convention expressly states that "[t]he sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State *shall not*

be a ground for refusing to return a child under this Convention." (Emphasis added.) This treaty provision qualifies the finality of any state-court custody judgment and thus ensures that there is still a live controversy before the federal court.

Norene relies on *Navani v. Shahani*, 496 F.3d 1121 (10th Cir. 2007), for the proposition that an order granting custody to one or another of the parents can moot a Hague Convention case, but *Navani* did not speak to this question. Indeed, the issue of habitual residence—and thus the question of which country's courts had the power finally to determine custody under the Convention—was not before the court in *Navani*; all parties agreed that the child's habitual residence was England. Rather, the question on appeal was whether the U.S. court that adjudicated the father's petition for return erred in concluding that an English custody order granted some custody rights to the father. *Id.* at 1125-26. While the appeal was pending, an English court entered a new custody order that granted the father sole custody. *Id.* at 1126. The Tenth Circuit concluded that this superseding custody order mooted the appeal—both because any possible error in the interpretation of the previous order was no longer of any moment given the new order, and because relief that directly conflicted with that ordered by the courts of the child's habitual residence would undermine the Hague Convention's purpose of allowing those courts to resolve the parents' custody disputes. *Id.* at 1127-29.

Here, in contrast, Iain and Norene dispute habitual residence. Until that question is resolved, we cannot say

which country's courts have the power to resolve the issue of custody. As Article 17 of the Convention implies, this antecedent question must be answered before we know what weight to give to the judgment of the Illinois court.

This makes sense, given the purpose of the Convention. Accepting Norene's position that an abducting parent may render a petition for return moot by racing to a courthouse in her chosen country to obtain a custody judgment would turn the Convention on its head. The entire purpose of the Convention is to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction. See Elisa Pérez-Vera, *Explanatory Report on the 1980 Hague Child Abduction Convention*, *in* Acts & Documents of the Fourteenth Session, Vol. 3, 17 (1980). To consider this case moot would encourage the very sort of jurisdictional gerrymandering the Convention was designed to prevent. We note as well that courts faced with similar arguments based on abstention, the *Rooker-Feldman* doctrine, and *res judicata* have held that these doctrines do not deprive the federal courts of jurisdiction to rule on the merits of Convention petitions, either in the first instance or on appeal. See, *e.g.*, *Yang v. Tsui*, 416 F.3d 199, 201-04 (3d Cir. 2005) (*Younger* abstention not appropriate); *Silverman v. Silverman*, 338 F.3d 886, 894 (8th Cir. 2003) (*Rooker-Feldman* doctrine inapplicable); *Holder v. Holder*, 305 F.3d 854, 864-66 & 867-72 (9th Cir. 2002) (*res judicata* inapplicable; *Colorado River* abstention inappropriate); *Mozes v. Mozes*, 239 F.3d 1067, 1085 n.55 (9th

Cir. 2001) (*Rooker-Feldman* doctrine inapplicable). Norene raises several cursory arguments based on the latter doctrines; like our sister circuits, we find no merit in these points.

B

The second preliminary issue concerns the district court's decision to admit the January 21 letter into evidence over Iain's objection that the letter is an offer of settlement and thus is inadmissible under Federal Rule of Evidence 408. Rule 408 says that evidence of "furnishing or offering or promising to furnish . . . a valuable consideration in . . . attempting to compromise the claim" may not be admitted to "prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." Iain argues that this language is broad enough to cover the letter's use here: the letter was an offer to compromise the parties' divorce dispute; the divorce proceeding included claims over both property and child custody; and the letter was being offered to prove the "invalidity" of Iain's petition for the return of the children on the theory that he had waived that right by consenting to Norene's custody.

The district court rejected Iain's argument under Rule 408 and admitted the letter, however, because in its view, the divorce and Convention proceedings were "entirely separate." The court also believed that Iain had failed to show that the use of the letter in the Convention case "would impair the settlement process in the underlying divorce action."

This ruling is flawed in at least two respects. First, the divorce and Convention proceedings are not "entirely separate." A decision or action in one proceeding almost inevitably will have an impact on the other. A successful petition for return identifies the proper forum for the custody determination in a divorce case, and (as the losing parent often fears) the courts of the habitual residence may be sympathetic to the local parent's position. More importantly, although the district court was correct to consider Rule 408's purpose in deciding whether to admit the letter, see *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005), in focusing on the letter's potential to impede settlement in *Iain and Norene's* ongoing divorce action, the district court was looking at the wrong thing. Rule 408 addresses the concern that a norm of admitting offers of settlement will reduce efforts to settle by others in the future; its focus is not on the effect of admitting an offer of settlement on *these parties'* likelihood of settling. Almost by definition, the parties in the present case have already failed to settle and are now deeply involved in litigation, and so for them, there is nothing left to chill.

When viewed in the proper perspective, there is little doubt that admitting a document like the January 21 letter has the potential to deter future efforts to settle international divorce and custody disputes. A parent in Iain's situation with an interest in reaching an out-of-court settlement with his or her spouse would have no incentive to make an offer without including some mention of child custody (often the single most

significant issue in a divorce). But if that parent knows that any offer related to custody may later be relied upon to find that the parent has abandoned his custody rights or consented to the child's remaining abroad, then that parent will be less willing to make any offer at all. In our view, the court should have excluded the letter pursuant to Rule 408.

That said, we must still consider whether this error had an effect on the outcome of the case. Since this was a trial to the court, the contents of the letter were very likely to come to the judge's attention anyway: the court had to read the letter in order to determine whether it was admissible. At that point, the horse was effectively out of the barn. In any event, the critical question is whether the judge was entitled to give weight to the letter. He should not have done so. Moreover, as we explain below, the letter in any event provides no basis for denying Iain's petition for return.

### III

Iain challenges the district court's findings that he (1) failed to establish that the children were habitually resident in Australia; (2) failed to establish that he was exercising his custody rights; and (3) consented to the children remaining permanently in the United States. Because any one of these findings would suffice to defeat a petition for return, we must affirm unless we conclude that the district court reached the wrong conclusion on each of them.

A

Everyone agrees that this is not a case of wrongful removal of the children; it is a case of wrongful retention. The first question is therefore when the retention began. The district court identified May 4, 2011, the day Iain filed his petition for return in the district court, as the date the retention began. It considered that to be the date when Iain first "unequivocally signaled h[is] opposition to [the children's] presence in the United States." Although Iain had expressed his intent to file a petition for return of the children in the January 21 letter (and again in a follow-up letter on February 16), the district court declined to view these statements as "unequivocal[] signal[s]" of opposition because, in the court's view, "it was apparent that Petitioner was referring to the Convention as a bargaining chip."

The date on which the wrongful retention commenced is a question of fact on which we would normally defer to the district court. See *Karkkainen v. Kovalchuk*, 445 F.3d 280, 290 (3d Cir. 2006). Here, however, nothing but speculation supports the district court's "bargaining chip" idea. Worse, whether Iain's mention of the Convention was meant as a "bargaining chip" is irrelevant to whether Iain signaled his opposition to the children remaining in the United States in the January 21 letter. What matters is that the January 21 letter unequivocally says that "[t]he parties' habitual residence is quite clearly Australia." It goes on to point out that the "clearly appropriate forum" for the parties' divorce proceedings is Australia and that it is "an abuse of process to unilater-

ally decide to remain in the United States." It then repeats that "Western Australia is the habitual residence of the children." Finally, the letter announces Iain's intent to file a petition under the Hague Convention, a step that he confirmed in his February 16 letter. Under the circumstances, it is hard to see how much more "unequivocal" one could be.

The district court was apparently under the impression that Iain then did nothing during the five months between the exchange of letters with Norene and the filing of the petition for return on May 4, but if so, it was mistaken. The petition reveals that in mid-February, Iain filed a request for return with the Central Authority in Australia. The Convention provides for the establishment of Central Authorities (designated agencies responsible for administering the Convention) and contemplates that parents will seek their assistance in obtaining the return of their children. Arts. 6-10. In Australia, the Central Authority directs parents seeking return of their children to file a request for return. See *About International Child Abduction*, Attorney General's Department, Australian Government, http://www.ag.gov.au/Families/Pages/Internationalfamilylaw/FAQaboutinternationalparentalchildabduction.aspx#to (last visited Nov. 13, 2012). That was exactly what Iain did here. In acting promptly to secure the return of the children according to procedures approved by both the Convention and the government of Australia, Iain properly signaled his opposition to the children's retention in the United States. For the district court to conclude that this opposition was not apparent until

May 4 was clear error. Accordingly, for purposes of our analysis, we assume that the retention began on January 21, or, at the latest, several weeks thereafter.

Before moving on, we note our concern with the district court's interpretation of the January 21 letter. The district court inferred that Iain was uninterested in the children except to the extent that they could be used as a "bargaining chip" to obtain a more favorable property settlement. We find nothing in the letter that supports such a view. Under the Convention, the merits of Iain and Norene's custody dispute are irrelevant to the distinct question whether that dispute should be resolved by the courts of Australia or the United States. Arts. 1 & 19; see also *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996). Assumptions about likely motives of either parent also play no part in Convention decisions. As it happens, fathers are far more likely than mothers to file petitions for return and access under the Convention. In 2008 (the last year for which detailed statistics are available), fathers filed roughly 69% of global applications (and 59% of U.S. applications) for return and roughly 79% of global applications (and 73% of U.S. applications) for access. See Nigel Lowe, *A Statistical Analysis of Applications Made in 2008 Under the Hague Convention of October 25, 1980 on the Civil Aspects of International Child Abduction*, Pt. I, 14, 54 (2011); *id.* at Pt. III, 199, 209. (We say "roughly" because the Hague Conference on Private International Law reports statistics on the people against whom petitions for return are filed, but it does not specifically report statistics on who files the petitions. Inferring how

many fathers file petitions for return or access is thus somewhat imprecise. Although in the vast majority of cases in which a petition is filed against a mother, the petitioner will be the father, the petitioner could conceivably be a grandparent, other relative, or an institution as well.)

B

To prevail on his petition, Iain was required to show that Australia was the children's habitual residence at the time of their retention in the United States. We explained in detail how to determine a child's habitual residence in *Koch v. Koch*, 450 F.3d 703 (7th Cir. 2006). In a case alleging wrongful retention, we determine a child's habitual residence by asking "whether a prior place of residence . . . was effectively abandoned and a new residence established . . . 'by the shared actions and intent of the parents coupled with the passage of time.'" *Norinder*, 657 F.3d at 534 (quoting *Koch*, 450 F.3d at 715). Because the parents often dispute their intentions, "the court should look at actions as well as declarations" in determining whether the parents "shared an intent to abandon a prior habitual residence." *Koch*, 450 F.3d at 715. In an appeal from a habitual residence determination, the court reviews findings on the parties' intent for clear error, while "[t]he ultimate determination of habitual residence is a mixed question of law and fact to which we will apply *de novo* review." *Id.* at 710.

The district court found that the children's habitual residence became the United States by January 21, 2011, at

the latest. This conclusion was premised on the following findings: (1) that Iain consented to the children's living in the United States in the January 21 letter; (2) that five months passed between the letter and the filing of the petition for return in district court; and (3) that Iain and Norene looked for houses in the United States.

As we already have explained, the first finding fundamentally misreads the January 21 letter. There is no need to repeat that discussion. Norene did not accept the offer contained in the letter, and it therefore dropped out of the picture.

We have already pointed out the problem with the second finding as well. Iain took prompt steps to secure the children's return by filing a request for return with the Australian Central Authority in mid-February 2011, as soon as it became apparent that a negotiated settlement was not forthcoming.

That leaves the third finding, which suggests that the court may have concluded that Iain and Norene came to the United States in June 2010 with the shared intention of establishing a new habitual residence in this country. Iain and Norene certainly could have established a new habitual residence in this fashion. See, *e.g.*, *id.* at 715 (change in habitual residence accomplished by a shared intent to abandon a prior habitual residence plus an "actual change in geography") (citing *Mozes*, 239 F.3d at 1078). But the district court never actually said that they did so, and we cannot find enough in the record to support the conclusion that Iain and Norene

arrived in the United States with the shared intention of abandoning Australia and establishing a new habitual residence here.

In considering the parties' intent, the district court focused on Norene's testimony that she and Iain looked at real estate in San Francisco and Seattle when they arrived in the United States in 2010. Norene testified that she and Iain "talked extensively" about the housing market, that she and a friend looked at a few houses in San Francisco (while Iain remained in the car), and that she and Iain met with a real estate agent in Seattle. Elsewhere in its opinion, the district court also noted that it was crediting Norene's testimony that she and Iain had always intended to return to the United States after their 1998 move. The district court seemed to view this intention to return as further evidence that the trip was understood to be a permanent move, notwithstanding the fact that Iain and Norene had been living in Australia for 12 years by the time they came to the United States in 2010.

While parts of Norene's testimony thus show that the couple might have been considering relocating to the United States, this is a perilously thin basis for inferring that their trip in 2010 was truly intended to be the start of that permanent move. Moreover, other uncontroverted evidence undermines this inference. For instance, the bulk of the family's possessions, as well as Chubba the family dog, remained in Australia; Iain and Norene were in the process of rebuilding their house in Australia; and Norene herself stated—both in

testimony and in emails to friends—that she intended to stay in the United States until June 2011 at the latest, and that she did not make up her mind to remain in the United States until she received the January 21 letter. The evidence that Iain and Norene mutually intended to abandon Australia and take up residence in the United States is simply too contradictory and underdeveloped to support the district court's habitual residence finding. Nor were the children in the United States for so long prior to the filing of the petition for return that their lives "bec[a]me so firmly embedded in the new country as to make [them] habitually resident" in the United States regardless of their parents' lack of mutual intent to establish a habitual residence here. *Mozes*, 239 F.3d at 1078.

## C

Assuming that the children's habitual residence was Australia, Iain must still show he was "actually exercis[ing]" his custody rights at the time of the retention. Art. 3. The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever "a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007) (internal quotation marks omitted). Indeed, "a person cannot fail to 'exercise' [his] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich*, 78 F.3d at 1066.

As the Sixth Circuit has explained, sound policy reasons support this liberal standard. U.S. courts are not well equipped to determine whether the courts of a child's habitual residence would conclude that a parent with *de jure* custody rights has nevertheless forfeited those rights "because he or she was not acting sufficiently like a custodial parent." *Id.* at 1065. Moreover, any determination that a parent has failed to behave in a sufficiently parent-like fashion comes dangerously close to an adjudication on the merits of the parents' custody dispute, which (to repeat) is something the Convention expressly reserves for the courts of the child's habitual residence. *Id.*; see also Arts. 1 & 19. Finally, the "confusing dynamics" of domestic strife "make it difficult to assess adequately the acts and motivations of a parent." *Friedrich*, 78 F.3d at 1065.

Although it acknowledged the liberal nature of the standard, the district court nevertheless found that Iain had "abandoned" his children. In support of this rather extreme conclusion, the court noted that Iain did not return to the United States after July 2010, that he ceased supporting Norene financially after January 21, 2011, and that his January 21 letter was mainly concerned with "the negotiation of support payments and property settlement."

All of those things may be true, but they do not add up to "unequivocal abandonment" of the children (as opposed, perhaps, to Norene). The district court overlooked Norene's undisputed testimony that Iain keeps "regular contact" with the children by speaking to them weekly

over Skype. Further, in faulting Iain for failing to return to the United States after July 2010, the district court ignored Norene and Iain's testimony that they had always intended that Iain would return to Australia—both for work and to oversee the construction of their house—in July or early August 2010. The court also failed to mention that Norene testified that Iain had plans to spend Christmas in the United States in 2010, and that he canceled those plans only after Norene filed for divorce. Finally, just as the January 21 letter does not show that Iain consented to the children's remaining in the United States, it similarly does not show that Iain was interested exclusively in reaching a settlement regarding marital property. A letter that requests custody for the children's entire summer vacation plus Christmas and asks for multiple visitation opportunities at other times of the year can hardly be characterized as indifferent to custody issues.

This leaves Iain's lack of financial support after January 21, 2011, as the sole basis for finding abandonment. This is not enough. Because non-exercise is evaluated at the time of the retention—which, as we have explained, must have occurred on January 21 or shortly thereafter—Iain's failure to provide support *after* the retention is irrelevant to whether he was exercising his custody rights when the wrongful retention began. See, *e.g.*, *Baxter v. Baxter*, 423 F.3d 363, 369 (3d Cir. 2005) ("[T]he record demonstrates that [the father] 'actually exercised' his custody rights under article 3 at the time of the removal and retention."); *Mozes*, 239 F.3d at 1084-85 ("Nor is there any doubt that [the father]

was exercising his parental rights and responsibilities up until the time [the mother] sought custody."). Neither the district court nor Norene identifies any case in which a court has found abandonment based on a lack of financial support, let alone a case that finds that a parent may forfeit his rights under the Convention by failing to send money to the abducting spouse even as he works actively to have the children returned. Indeed, the cases that address some version of this issue have found that a parent does not fail to exercise his custody rights merely by failing to provide financial support for some period prior to the removal or retention. See *Baxter*, 423 F.3d at 369-70 (lack of financial support for several weeks prior to the retention did not indicate that father was not exercising custody rights); *Habrzyk v. Habrzyk*, 759 F. Supp. 2d 1014, 1023 (N.D. Ill. 2011) (infrequent financial support insufficient to show non-exercise); *In re Polson*, 578 F. Supp. 2d 1064, 1072 (S.D. Ill. 2008) (father was exercising custody rights even though he ceased to support family financially after mother filed for divorce). Finally, we note that whether one parent is required to pay support to the other is an issue on the merits of a divorce proceeding, and we are thus wary of allowing the presence or absence of financial support to factor too prominently in the analysis of the exercise of custody rights at the time of the removal or retention.

Using the appropriate standard, we cannot find on the current record that Iain's failure to provide financial assistance while Convention proceedings are pending amounts to a failure to exercise his custody rights.

## D

Finally, even if Iain had established a case for return under the Convention, he could have waived that right if he consented to, or acquiesced in, the children's remaining in the United States with their mother. Art. 13. Consent and acquiescence are analytically distinct defenses to return under the Convention. *Baxter*, 423 F.3d at 371. The consent exception applies when a petitioning parent, either expressly or through his conduct, agrees to a removal or retention before it takes place. *Id.* A parent's consent need not be formal, but "it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Id.*; see also *Mota v. Castillo*, 692 F.3d 108, 117 (2d Cir. 2012); *Larbie v. Larbie*, 690 F.3d 295, 308-09 (5th Cir. 2012). Acquiescence is implicated if a petitioning parent agrees to or accepts a removal or retention after the fact. *Baxter*, 423 F.3d at 371. Unlike consent, acquiescence must be formal, and might include "testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070. One way or another, the "exceptions [must] be drawn very narrowly lest their application undermine the express purposes of the Convention." 51 Fed. Reg. 10494, 10509 (Mar. 29, 1986). It is also worth remembering that the Article 13 exceptions are permissive: a court may order return even if it finds that the parent opposing the petition has established that one of the exceptions applies. Art. 13; 51 Fed. Reg. at 10509.

The district court found that Norene had established consent. The bases for this conclusion will by now be familiar: they are the January 21 letter, which the district court characterized as indicating Iain's "unconditional consent" to the children remaining in the United States, Iain's failure to visit the United States after July 2010, and his failure to provide financial support.

Our concerns with the district court's analysis will also be familiar. The January 21 letter cannot be read as an expression of consent, let alone unconditional consent, to anything. The letter is an opening offer, a single stage in a negotiation; it concedes nothing and in any event was rendered null by the parties' failure to come to an agreement. It is apparent that Iain did not "actually contemplate [or] agree" to the children's remaining in the United States without Norene's agreement to conditions that she consistently rejected.

Apart from the letter, the district court's remaining justifications are either clearly erroneous or irrelevant. As previously discussed, Iain was involved in the children's lives after July 2010, and the discussion of financial support is unrelated to Iain's consent or acquiescence in the children's remaining in the United States.

**IV**

Having concluded that the district court's decision in this case cannot stand, we are left with the question of how to proceed. Two options exist: an outright order for the children to be returned to Australia pursuant to

the Convention, or a remand for further factfinding. Although we regret the need to prolong this case any further, we conclude that the latter is necessary. Several crucial issues were not fully developed in the previous proceedings, and these gaps in the record must be filled before a final decision is rendered. On remand, the district court must resolve at least the following questions, taking evidence as necessary:

1.   What was Iain and Norene's mutual intent regarding the trip to the United States in June 2010? Was this intended as an extended vacation or as a permanent move?

2.   What has been the precise nature of Iain's participation in the Illinois divorce proceedings, and to what extent, if at all, does this participation indicate that Iain either consented to or acquiesced in the children's retention in the United States?

3.   To the extent the children have "attained an age and degree of maturity at which it is appropriate to take account of their views," Art. 13, what is the children's attitude to being returned to Australia? In conducting this inquiry, we caution that the district court must be attentive to the possibility that the children's views may be the product of "undue influence" of the parent who currently has custody. 51 Fed. Reg. 10510.

## V

In returning this case to the district court, we emphasize again that this is a dispute about which court

system should resolve the underlying issue of child custody; it is not a dispute about which parent is preferable or the terms under which custody will be granted. We are confident that either the courts of Western Australia or the courts of Illinois are fully capable of resolving these matters. In that spirit, we REVERSE and REMAND the judgment of the district court.