**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE ICJ, an infant under the age of 16, | No. 21-35159 |
| | D.C. No. 2:20-cv-00475-SAB |
| KERRY JONES, *Petitioner-Appellant*, | |
| v. | OPINION |
| CASSANDRA FAIRFIELD, *Respondent-Appellee.* | |

Appeal from the United States District Court
for the Eastern District of Washington
Stanley A. Bastian, Chief District Judge, Presiding

Argued and Submitted August 13, 2021
Seattle, Washington

Filed September 15, 2021

Before: David M. Ebel,* Carlos T. Bea, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Ebel

---

* The Honorable David M. Ebel, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

## SUMMARY[**]

### Hague Convention

The panel vacated the district court's denial of Kerry Jones's petition for the return of his child to France under the Hague Convention on the Civil Aspects of International Child Abduction, and remanded for further proceedings.

Cassandra Fairfield, the child's mother, took the child to the United States. Jones petitioned for the child's return to France so that French courts could make a custody determination. The district court denied the petition on the alternative grounds that Fairfield did not wrongfully remove the child, and even if she did, returning the child to France would present a grave risk.

Agreeing with other circuits, the panel held that the district court erred as a matter of law in determining that Jones cutting off financial support was sufficient to establish that he abandoned the child and thus was not exercising his custody rights, and that Fairfield's removal of the child therefore was not wrongful.

The panel held that the district court further erred in declining to return the child to France based on a "grave risk" defense, without first considering whether there were alternative remedies available to protect the child and permit her return to France for the period of time necessary for French courts to make the custody determination.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Finally, the district court erred in relying in part on the COVID-19 pandemic to deny Jones's petition because the record did not include any evidence addressing what specific pandemic-related risk returning the child to France would present.

---

## COUNSEL

Robert S. Michaels (argued), Dobrish Michaels Gross LLP, New York, New York, for Petitioner-Appellant.

Kenneth R. Zigler Jr. (argued) and Joanna L. Puryear (argued), Zigler Family Law, Spokane, Washington for Respondent-Appellee.

---

## OPINION

EBEL, Circuit Judge:

Kerry Jones, a British citizen, and his wife Cassandra Fairfield, a citizen of the United States, married and lived in France. In 2018, they had a daughter, ICJ, who resided with them, or one of them, in France until October, 2020. Then, after marital problems arose and Jones filed for divorce in France, Fairfield took ICJ to the United States, without the assent of Jones. Jones initiated this litigation under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), seeking an order returning the child to France so French courts could decide custody. The Hague Convention generally requires the prompt return of a child who is wrongfully removed from her country of "habitual residence" during a domestic dispute in order to allow that country to make necessary

custody determinations. Concluding the district court erred in denying Jones's petition for ICJ's return to France, we **VACATE** the district court's decision and **REMAND** for further proceedings.

## I. BACKGROUND

In an effort to expedite these proceedings in the district court, the parties agreed during a video hearing to present this case through documentary evidence rather than by calling witnesses. The documentary evidence included declarations by the parties which contradicted each other in numerous and material ways.[1] The district court did not expressly resolve those material factual disputes. Here, we provide just a thumbnail sketch of the conflicting evidence.

Jones and Fairfield met online in 2013. At that time, Jones was fifty years old, a British citizen living in France; Fairfield was an eighteen-year-old high school student in the United States. Fairfield visited Jones several times in France. The couple eventually married in 2017. Their daughter ICJ was born in France in August 2018.

In January 2020, Jones and Fairfield began talking about separating. The couple's marital discord intensified when, in March 2020, Jones began working full time from their home due to the COVID-19 pandemic. According to Fairfield: Soon after Jones began working from home, she discovered him viewing child pornography. On another occasion, she caught Jones watching child pornography

---

[1] While Jones's declaration and verified petition were sworn under penalty of perjury, it does not appear that Fairfield's declaration was sworn. Jones does not raise lack of swearing as a ground for reversal.

while ICJ was in the room.[2]  Fairfield further discovered that Jones had downloaded hundreds of files of child pornography.

Jones denies all of this.  He does, however, acknowledge his prior Texas conviction for possessing child pornography. Based on that conviction, the United States removed Jones, a British citizen, and has precluded him from returning. Fairfield asserts Jones never told her about this conviction and she only discovered it sometime after the couple separated.  Jones contends Fairfield has known all along about his prior conviction.

According to Fairfield, after she confronted Jones about his child pornography addiction, he "became aggressive" toward her (E.R. 250 ¶ 11), throwing a glass at her that shattered near Fairfield and their child, tossing the child's stroller out a window, flipping a table over, holding Fairfield down and screaming that she made him crazy and violent, and on one occasion raping her.  Jones acknowledges throwing the glass, but denies that it shattered near either Fairfield or ICJ.  He denies Fairfield's other accusations of abuse and rape.

Between April 24 and May 1, 2020, while the family was still living together, Jones numerous times threatened suicide if Fairfield left him.  On May 1, 2020, after Fairfield asked Jones to move to another of their houses,[3] Jones hung himself from a tree outside their home.  He survived after Fairfield and several neighbors cut him down.  While Jones

---

[2] Fairfield has not claimed nor provided any evidence for the idea that Jones affirmatively showed ICJ child pornography.

[3] The couple owned a family home plus three nearby properties that they rented to vacationers.

spent two days recovering in the hospital, Fairfield and ICJ moved to another of the family's properties. After Jones recovered from the suicide attempt, he "often" visited Fairfield and ICJ.

With Jones's permission, Fairfield took ICJ to visit Fairfield's family in the United States in June 2020. When Fairfield and ICJ returned to France, in mid-July, they lived in a hotel and then at an Airbnb rental. During this time, Jones visited ICJ frequently and, with Fairfield's consent, Jones kept ICJ overnight on several occasions.

In late July 2020, Jones showed Fairfield a letter he threatened to send to her former employer in Washington, as well as the Spokane newspaper and the Washington State Patrol, accusing Fairfield of being a pedophile and mentally ill. Jones contends this was an attempt to convince Fairfield to be reasonable about the divorce proceedings. According to Fairfield, when she met Jones at a park on July 30 so Jones could play with ICJ, Jones threatened to blackmail Fairfield in order to take custody of ICJ.

Jones then filed for divorce in France and Fairfield took ICJ to northern France, about five hours away. Fairfield initially stayed with friends and then moved with ICJ into an Airbnb. Although Fairfield and Jones continued to communicate with each other via texts, Fairfield did not tell Jones where she and ICJ were.

Fairfield asserts that, at this same time, Jones left the family residence and began living in a tent in order to hide from French authorities because Jones feared they had discovered his child pornography. Jones denies this this was the reason he left the residence.

Jones filed a police report seeking help finding Fairfield and ICJ, and he hired an attorney to pursue criminal charges against Fairfield for absconding with their daughter. Fairfield, in turn, unsuccessfully sought police protection from Jones. Both Jones and Fairfield hired divorce lawyers; the French courts set a hearing in the divorce proceeding for November 17, 2020.[4]

According to Fairfield, in mid-August, Jones cut off all financial support for her and ICJ by draining the couple's joint bank account. After that, Fairfield contends that she was forced to live with ICJ in homeless shelters. While Jones does not dispute that Fairfield and ICJ lived for a period of time in homeless shelters, he denies that he ever cut off Fairfield and ICJ financially and further asserts that Fairfield and ICJ could have lived at one of the couple's properties.

In mid-October, at her attorney's urging, Fairfield revealed her and ICJ's location. Although Fairfield feared that Jones would come looking for her and ICJ, Jones's attorney directed him not to contact Fairfield or to try to see ICJ. The couple's divorce attorneys then began to negotiate visitation for Jones. To facilitate those negotiations, Jones eventually agreed that any visitation be supervised.

While negotiations for visitation were ongoing and less than three weeks before the first hearing scheduled in the French divorce proceedings, Fairfield left France with ICJ

---

[4] The record does not reflect the status of the French divorce proceedings.

on October 29, 2020.[5]  At that time, it had been three months since Jones had seen ICJ, and two and one-half months since, according to Fairfield, Jones had cut off any financial support.  Fairfield filed for divorce in Washington State on November 17, 2020.

Jones initiated this litigation in the Federal District Court for the Eastern District of Washington under the Hague Convention on December 29, 2020, seeking ICJ's return to France so French courts could determine custody of ICJ.[6]  *See* 22 U.S.C. § 9003(b).  The district court, on January 28, 2021, denied Jones's petition, and his motion for reconsideration.  We have jurisdiction to review those decisions under 28 U.S.C. § 1291.

## II. THE HAGUE CONVENTION

We begin with a quick overview of the Hague Convention.  "[I]n 1980 the Hague Conference on Private International Law adopted the Convention" "[t]o address 'the problem of international child abductions during domestic disputes.'"  *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)).  "The Convention states two primary objectives: 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights

---

[5] Fairfield says her family sent her money for the trip to the United States, while Jones contends Fairfield instead used the couple's joint funds.

[6] Both the United States and France are signatories bound by the Hague Convention.  *See* U.S. Hague Convention Treaty Partners, Travel. State.Gov, https://travel.state.gov/content/travel/en/International-Parent al-Child-Abduction/abductions/hague-abduction-country-list.html  (last visited July 7, 2021).

of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Id.* at 4–5 (quoting Hague Convention on the Civil Aspects of International Child Abduction ("H.C."), art. 1, Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11). "It is the Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (quoting H.C., Preamble).

"To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Id.* (citing H.C., Art. 12). The removal or retention is wrongful if it both violates one of the parent's custody rights provided by the laws of the child's country of habitual residence and that parent is actually exercising those custody rights at the time of removal. H.C., Art. 3.

"The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings. . . . Upon the child's return, the custody adjudication will proceed in that forum." *Monasky*, 140 S. Ct. at 723.

"The return remedy is not absolute," however. *Lozano*, 572 U.S. at 5. The Convention recognizes several "narrow" defenses to, or exceptions from, returning the child to her country of habitual residency. 22 U.S.C. § 9001(a)(4); *see also Lozano*, 572 U.S. at 6. Relevant here, Article 13 excuses a court from ordering a child's return where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." H.C., Art. 13(b); *see also Lozano*, 572 U.S. at 5. Even where the court finds such a grave risk, however, the district court still has discretion to

order the child's return.  *See Radu v. Shon*, —F.4th —, 2021
WL 3883013, at *3 (9th Cir. Aug. 31, 2021).

Where the Convention's return remedy is appropriate,
"the Convention instructs contracting states to 'use the most
expeditious procedures available' to return the child to her
habitual residence."  *Monasky*, 140 S. Ct. at 723–24 (quoting
H.C., Art. 2. and citing H.C., Art. 11 (prescribing six weeks
as normal time for return-order decisions)).

The United States ratified the Hague Convention in
1988, and Congress implemented the Convention through
the  International  Child  Abduction  Remedies  Act
("ICARA"), 22 U.S.C. §§ 9001–11.[7]  *See Lozano*, 572 U.S.
at 6.

In reviewing a district court's decision in a Hague
Convention case, "we review the district court's factual
determinations for clear error, and the district court's
application of the Convention to those facts *de novo*."
*Flores Castro v. Hernandez Renteria*, 971 F.3d 882, 886 (9th
Cir. 2020).  We review for an abuse of discretion the district
court's determination of whether to return a child to her
country of habitual residence in the face of a grave risk.  *See
Radu*, 2021 WL 3883013, at *3.

### III.  DISCUSSION

In this case, the district court denied Jones's Hague
Convention petition to return ICJ to France, ruling
alternatively: 1) Fairfield did not wrongfully remove ICJ
from France because Jones, at that time, was not actually
exercising his custody rights to ICJ because he cut off

---

[7] Congress originally codified ICARA at 42 U.S.C. §§ 11601–10,
*see Lozano*, 572 U.S. at 6, but later transferred it to Title 22.

financial support for the child.  But 2) even if Fairfield wrongfully removed ICJ, returning her to France would present a grave risk of placing the child in an intolerable situation, in light of Jones's instability.  The district court further relied on the pandemic to support the court's decision not to return ICJ to France for a custody determination.

We address the three legal errors in the district court's rulings that require us to vacate the district court's decision and remand: 1) Assuming Jones cut off financial support for ICJ, the district court erred as a matter of law in determining that was sufficient to establish that Jones clearly and unequivocally abandoned the child, the showing required for deeming a parent not to be exercising custody rights.  2) The district court further erred in declining to return ICJ to France based on a "grave risk" defense, without first considering whether there are alternative remedies available to protect the child and permit her return to France for the period of time necessary for French courts to make the custody determination.  3) The district court also erred in relying in part on the pandemic to deny Jones's petition because the record did not include any evidence addressing what specific pandemic related risk returning ICJ to France would present.

## A.  Fairfield wrongfully removed ICJ from France.

The Hague Convention requires that a "child *wrongfully* removed from her country of 'habitual residence' ordinarily must be returned to that country."  *Monasky*, 140 S. Ct. at 722–23 (emphasis added); *see* H.C., Arts. 3, 12.

> The removal or retention of a child is to be considered wrongful where—

a) it is in breach of rights of custody attributed to a person . . . , either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of the removal . . . *those rights were actually exercised*, either jointly or alone, or *would have been so exercised but for the removal* . . . .

H.C., Art. 3 (emphasis added).

The district court correctly determined that ICJ's country of habitual residence was France, French law provided both Jones and Fairfield with the right to custody of ICJ, and Fairfield's leaving France with ICJ breached Jones's custody rights.[8] Nevertheless, the district court ruled that Fairfield's removing ICJ from France was not "wrongful" because at the time of removal Jones was not actually exercising his custody rights, in light of his failure to support ICJ financially. That was error.

The Hague Convention does not explain how one "exercise[s]" custodial rights. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996). But federal circuit courts in the United States have consistently required a showing that a parent has clearly and unequivocally abandoned a child before ruling that that parent is *not* actually exercising his custody rights. *See id.* at 1066; *see*

---

[8] In her answering brief, Fairfield states in a single phrase that ICJ's habitual residence is, instead, Spokane, Washington, without any further argument. That perfunctory assertion is insufficient to raise an adequate challenge to the district court's determination that France is ICJ's country of habitual residence.

*Asvesta v. Petroutsas*, 580 F.3d 1000, 1017–18 (9th Cir. 2009) (endorsing this standard); *see also Lopez v. Bamaca*, 455 F. Supp. 3d 76, 82 & n.8 (D. Del. 2020) (noting "virtually every circuit" follows *Friedrich*'s abandonment test, citing cases). The parties here agree that this is the relevant legal standard.

In applying this standard, courts "liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich*, 78 F.3d at 1065 (6th Cir.).

> Once [a court] determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts.

*Id.* at 1066 (citing 42 U.S.C. § 11601(b)(4), now found at 22 U.S.C. § 9001(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.")).

Jones, as the petitioning parent, had the initial burden of proving by a preponderance of the evidence that he was actually exercising his custody rights to ICJ at the time Fairfield removed the child from France. *See* 22 U.S.C. § 9003(e)(1) (stating that petitioner had burden of proving wrongful removal); H.C., Art. 3 (listing as one element of wrongful removal proof that petitioner was exercising his custody rights). Jones's burden, however, was "minimal," *Asvesta*, 580 F.3d at 1018, and he clearly met it here.

The record indicates that, after Jones and Fairfield separated in May 2020, Jones saw ICJ often, both before and after Fairfield took ICJ to visit Fairfield's family in the United States. Jones kept ICJ overnight on several occasions, with Fairfield's consent. Jones did not see ICJ after July 30, but it is undisputed that was because Fairfield took ICJ to northern France and did not reveal their whereabouts to Jones. Jones presented evidence, including text messages and emails, indicating that he frequently asked Fairfield to let him see ICJ, to no avail. When Fairfield revealed her location, in mid-October 2020, Jones attorney directed him *not* to try to see the child, while the divorce attorneys negotiated visitation. *Cf. Stirzaker v. Beltran*, No. CV09-667-N-EJL, 2010 WL 1418388, at *5–6 (D. Idaho April 6, 2010) (unreported) (holding father was actually exercising his custody rights, even though he acquiesced to his attorney's advice to move out of the family home and not have contact with the family after the mother filed criminal charges against him, where before that the father had been involved in the child's care). It was while these negotiations were ongoing, and just a few weeks before the first hearing in the French divorce proceeding was to occur, that Fairfield left France with ICJ. Jones's actions seeking to establish visitation belie any claim that he clearly and unequivocally abandoned ICJ. *See Walker v. Walker*, 701 F.3d 1110, 1121–22 (7th Cir. 2012) (noting father's letter requesting specific visitation times "can hardly be characterized as indifferent to custody issues").

Because Jones made the required minimal showing that he was exercising his custody rights, the burden shifted to Fairfield, as the party opposing returning ICJ to France, to prove by a preponderance of the evidence that Jones was not actually exercising his custodial rights. *See* H.C., Art. 13(a) (recognizing this defense to return); 22 U.S.C.

§ 9003(e)(2)(B) (indicating respondent has to prove an Article 13(a) defense by a preponderance of the evidence). Even accepting Fairfield's disputed assertion that Jones cut off financial support to Fairfield and ICJ for two and one-half months, Fairfield has not shown that Jones clearly and unequivocally abandoned ICJ.

Other courts have reached the same conclusion under circumstances similar to these, where a parent with custody rights tries to maintain contact with a child after the other parent leaves, even though that parent stops financial support for short periods of time. In *Walker*, for example, the Seventh Circuit addressed a situation where a U.S. citizen and an Australian citizen moved to Australia, had a family, and lived there for 12 years. 701 F.3d at 1114. The mother took the children to the United States for an extended visit, then decided they would remain in America, where she filed for divorce. *Id.* at 1114–15. The Seventh Circuit held that the father—who remained in Australia and briefly stopped providing financial support just before the mother's wrongful retention of the children in the United States—was actually exercising his custody rights, where he contacted the children weekly via Skype and his Australian divorce attorney sent a letter proposing specific visitation dates. *Id.* at 1115, 1121–22. In light of that regular contact, and efforts to obtain specific visitation rights, the Seventh Circuit declined to find clear and unequivocal abandonment based solely on a brief lack of financial support. *Id.* at 1121–22. In reaching that conclusion, the Seventh Circuit noted that

> [n]either the district court nor [the mother] identifies any case in which a court has found abandonment based on a lack of financial support, let alone a case that finds that a parent may forfeit his rights under the

> Convention by failing to send money to the
> abducting spouse even as he works actively
> to have the children returned.

*Id.* at 1122. The Seventh Circuit further noted

> that whether one parent is required to pay
> support to the other is an issue on the merits
> of a divorce proceeding, and we are thus wary
> of allowing the presence or absence of
> financial support to factor too prominently in
> the analysis of the exercise of custody rights
> at the time of the removal or retention.

*Id.*; *cf. Habrzyk v. Habrzyk*, 759 F. Supp. 2d 1014, 1023–25
(N.D. Ill. 2011) (holding father was actually exercising his
custody rights where he visited the child and "infrequently"
"provided some monetary support"); *In re Polson*,
578 F. Supp. 1064, 1067, 1072 (S.D. Ill. 2008) (holding
father was actually exercising his custody rights where he
maintained contact with the child and continued to support
the mother and child until the mother filed for divorce).

Similarly, in *Baxter v. Baxter*, the Third Circuit held that
a father was actually exercising his custody rights, even
though he withheld financial support for "a few weeks"
while mother and child visited the United States from
Australia and before the mother informed the father she
intended to stay in the United States. 423 F.3d 363, 369–70
(3d Cir. 2005). In that case, as in our case, the family had
lived together as a family in Australia before mother and
child visited America and while they were together the
family continued to support the family financially. *See id.*
at 370. *See also Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F. 3d
259, 277 (3d Cir. 2007) (noting "very little" is required to

show parent is actually exercising custody (quoting *In re Application of Adan*, 437 F.3d 381, 391 (3d Cir. 2006))).

The test Fairfield had to meet to show that Jones had clearly and unequivocally abandoned ICJ is "stringent." *Baxter*, 423 F.3d at 370 (3d Cir.) (citing *Friedrich*, 78 F.3d at 1065–66 (6th Cir.)). Here, then, even assuming that Jones cut off Fairfield and ICJ financially for two and one-half months after Fairfield took ICJ to northern France, that is insufficient by itself to establish that Jones clearly and unequivocally abandoned ICJ, in light of Jones's continuous efforts to see the child. Because that is the only reason advanced by the district court to support its abandonment ruling, the district court erred in concluding Jones was not exercising his custody rights at the end of October 2020, when Fairfield took ICJ to the United States. Contrary to the district court's decision, then, Fairfield wrongfully removed ICJ from France.

Ordinarily, the Hague Convention requires the return of a child wrongfully removed from her country of habitual residence, subject only to a few narrow exceptions. *See* 22 U.S.C. § 9001(a)(4). Here, in its alternative ruling, the district court held that Fairfield had established that one of those narrow exceptions—when return presents "a grave risk" of placing the child "in an intolerable situation," H.C., Art. 13(b)—precludes returning ICJ to France. As we explain next, that ruling was inadequate because the district court never considered whether there are "alternative remedies" available that could permit returning ICJ to France while at the same time protecting her from harm. *Radu*, 2021 WL 3883013, at *3–4 & *3 n.2.

## B. The District Court failed to consider whether French courts could mitigate any grave risk to ICJ if she returns to France.

Fairfield had the burden of proving a "grave risk" defense under Article 13(b) by clear and convincing evidence. *See* 22 U.S.C. § 9003(e)(2). The district court determined that Fairfield had met her burden, ruling:

> Here, the Court finds that if the child were returned to France there is a grave risk that their return would place the child in an intolerable situation. Although Jones attempts to persuade the Court that his domestic life is stable, it is undisputed that Jones attempted suicide to coerce Fairfield into staying, threatened to blackmail her, and cut off financial support. Also, the Court cannot ignore the allegations of Jones viewing child pornography in the presence of the child. While most of these actions were directed at Fairfield, the Court is concerned they reflect instability on the part of Jones that would place the child in an intolerable situation.

(E.R. 15–16 (footnote omitted).)

Although Jones disputes the district court's "grave risk" determination, "[w]e need not reach that issue . . . because . . . , even if such risk existed, the district court erred in failing to consider alternative remedies by means of which [ICJ] could be transferred back to [France] without" placing her in an intolerable situation. *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005). This circuit requires that, "before denying the return of a child because of a grave risk

of harm, a court must consider alternative remedies that would 'allow both the return of the [child] to [her] home country and [her] protection from harm.'" *Id.* (quoting *Blondin v. Dubois*, 189 F.3d 240, 249 (2d Cir. 1999)). Further, "because the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the *immediate* future." *Id.* at 1037 (emphasis added). The question, then, "is not whether the child would face a risk of grave harm should she *permanently* reside in [France], but rather whether she would face such a risk while courts in [France] make a custody determination." *Zaragoza Gutierrez v. Juarez*, No. CV-17-02158-PHX-GMS, 2017 WL 3215659, at *5 (D. Ariz. July 28, 2017) (citing *Mozes v. Mozes*, 239 F.3d 1067, 1086 n.58 (9th Cir. 2001), *abrogated on other grounds by Monasky*, 140 S. Ct. at 723, 725–26, (addressing standard for determining child's country of "habitual residence"), and *Friedrich*, 78 F.3d at 1069 (6th Cir.)).

We, therefore, remand so the district court can consider the possibility that alternative remedies exist and could permit returning ICJ to France for a custody determination. On remand the district court might consider, for example, whether ICJ can be safely returned to France in the custody of her mother, or in a third party's custody. *See Gaudin*, 415 F.3d at 1037; *see also Blondin*, 189 F.3d at 249 (2d Cir.) (suggesting similar possibilities after noting that granting father's Hague Convention petition "would not . . . invariably entail turning the children over to his custody"). Jones suggested similar possibilities to the district court. On remand, "[p]erhaps the court would deem one of these undertakings appropriate, or another, or perhaps it would conclude that it would be impossible to return [ICJ] to

[France] without placing [her] at risk.  We do not in any way prejudge the district court's decision."**9**  *Gaudin*, 415 F.3d at 1037.

This court has recently addressed in detail the relevant considerations that may affect that determination and what information might be needed, and we identified resources available to aid the district court, including the United States State Department's Office of Children's Issues.  *See Radu*, 2021 WL 3883013, at \*4–6.  Importantly, part of the analysis on remand should include consideration of whether any suggested conditions for ameliorating a grave risk to ICJ would be enforceable or present "sufficient guarantees of performance" in France.  *Walsh v. Walsh*, 221 F.3d 204, 219 (1st Cir. 2000) ("A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings."); *see Radu*, 2021 WL 3883013, at \*4; *see also, e.g.*, *Saada v. Golan*, 930 F.3d 533, 539–40 (2d Cir. 2019) (discussing potential difficulties in enforcing undertakings meant to ameliorate a grave risk to the child, citing cases), *petition for cert. filed*, (U.S. Jan. 21, 2021) (No. 20-1034).  The district court "need[s] to determine whether and how the alternative remedy is likely to be performed."  *Radu*, 2021 WL 3883013, at \*4.

"We are bound, therefore, to remand for the district court to determine whether any such remedy is possible.  That inquiry . . . is inseparably bound up with the question [of] whether a grave risk . . . exists in the first place."  *Gaudin*,

---

**9** *See generally Baran v. Beaty*, 526 F.3d 1340, 1349–51 (11th Cir. 2008) (discussing concept of "undertakings," or alternative remedies, as a possible means of protecting a child from a "grave risk" when ordering his returned to his country of habitual residence for a custody determination).

415 F.3d at 1036. Those determinations should be made "in light of circumstances as they exist in the present." *Id.* During oral argument, the parties indicated that French courts have now made some sort of custody decision in the parties' French divorce proceedings. On remand, that information may be helpful to inform the district court's determination as to whether French courts would be able to protect ICJ upon her return to France for a custody determination. *See also Blondin*, 189 F.3d at 249 (2d Cir.) (remanding so district court could further consider "the range of remedies that might allow *both* the return of the children to their home country *and* their protection from harm, pending a custody award in due course by a French court with proper jurisdiction"). Any "alternative remedy must significantly reduce, if not eliminate, the grave risk of harm to" ICJ. *Radu*, 2021 WL 3883013, at *4.

## C. The district court also erred in relying on the COVID-19 pandemic.

In refusing to return ICJ to France, the district court noted that "[t]he COVID-19 pandemic provides an additional layer of concern for the child to travel back to France." (E.R. 16.) It appears from this brief statement that the district court implicitly decided that sending ICJ back to France during the pandemic presented a "grave risk" of "expos[ing] the child to physical . . . harm," H.C., 13(b). *See Chambers v. Russell*, No. 1:20CV498, 2020 WL 5044036, at *14 (M.D.N.C. Aug. 26, 2020) (discussing pandemic in context of "grave risk" defense). That was error because there is simply no evidence in the record addressing whether COVID-19 would present a "grave risk" to ICJ's health if she returned to France. *See Filho v. de Albuquerque*, No. 1:20-CV-01421-RBJ, 2020 WL 9455201, at *9 (D. Colo. Aug. 21, 2020) (rejecting "grave risk of harm" defense

based in part on argument that it was safer in Colorado than in Brazil during the pandemic, where there was no evidence to support that assertion and "[t]he Court has no basis to speculate that reasonable and necessary precautions will not be taken to protect [the child] from the virus upon her return to Brazil"); *see also Chambers*, 2020 WL 5044036, at \*14 (holding "COVID-19 does not satisfy the Grave-Risk Defense"). *See generally Nunez v. Ramirez*, No. CV07-01205-PHX-EHC, 2008 WL 898658, at \*5 (D. Ariz. Mar. 28, 2008) (noting "[p]roof of grave risk of harm requires 'specific evidence of potential harm' to children" (quoting *Rydder v. Rydder*, 49 F.3d 369 (8th Cir.1995)). On remand, the district court can consider any evidence presented on any specific *current* risk presented to ICJ by the ongoing pandemic. *See Gaudin*, 415 F.3d at 1036 (directing district court, on remand, to consider existence of any possible remedies to any grave risk presented to the child "in light of circumstances as they exist in the present"); *see also id.* at 1037.

## IV. CONCLUSION

For the foregoing reasons, we **VACATE** the district court's decision to deny Jones's petition seeking ICJ's return to France and **REMAND** for further proceedings consistent with this opinion. "Consistent with the goals of the Convention, this litigation should conclude as quickly as possible." *Radu*, 2021 WL 3883013, at \*7.